Exhibit A



# Notice of Service of Process

| | |
|---|---|
| **Primary Contact:** | Jean Ridge-Dimm<br>EDF Compliance<br>10090 Lake Vista Ct<br>Parkland, FL 33076-4136 |

| | |
|---|---|
| **Entity:** | Dabble Sports, LLC<br>Entity ID Number 4384104 |
| **Entity Served:** | Dabble Sports, LLC |
| **Title of Action:** | Kentucky Gambling Recovery LLC vs. Underdog Sports Holdings, Inc. dba Underdog Fantasy |
| **Matter Name/ID:** | Kentucky Gambling Recovery LLC vs. Underdog Sports Holdings, Inc. dba Underdog Fantasy (18111788) |
| **Document(s) Type:** | Summons and Amended Complaint |
| **Nature of Action:** | Violation of State/Federal Act |
| **Court/Agency:** | Franklin County Circuit Court, KY |
| **Case/Reference No:** | 25-CI-00513 |
| **Jurisdiction Served:** | Kentucky |
| **Date Served on TCC:** | 10/31/2025 |
| **Answer or Appearance Due:** | 20 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Federal Express |
| Sender Information: | Bahe Cook Cantley & Nefzger PLC<br>502-587-2002 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to The Company Corporation**

251 Little Falls Drive, Wilmington, Delaware 19808-1674   (888) 690-2882   |   sop@cscglobal.com



*Plaintiff,* **KENTUCKY GAMBLING RECOVERY LLC VS. UNDERDOG SPORTS HOLDINGS,,** *Defendant*

## TO:  **DABBLE SPORTS, LLC**

The Commonwealth of Kentucky to Defendant:

You are hereby notified that a **legal action has been filed against you** in this Court demanding relief as shown on the document delivered to you with this Summons. **Unless a written defense is made by you or by an attorney on your behalf within twenty (20) days** following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached complaint.

The name(s) and address(es) of the party or parties demanding relief against you or his/her (their) attorney(s) are shown on the document delivered to you with this Summons.

*Kathryn Marshall*

Franklin Circuit Clerk
Date: **10/29/2025**

---

## Proof of Service

This Summons was:

☐ Served by delivering a true copy and the Complaint (or other initiating document)

To: _____

☐ Not Served because: _____

Date: _____, 20_____

_____
Served By

_____
Title

---



Page 1 of 1

*eFiled*

B610F665-A577-4843-B393-9E26CB349B97 : 000001 of 000067

COMMONWEALTH OF KENTUCKY
FRANKLIN CIRCUIT COURT
DIVISION 1
CIVIL ACTION NO. 25-CI-00513

KENTUCKY GAMBLING RECOVERY LLC                                    PLAINTIFF

**FIRST AMENDED COMPLAINT**

v.

UNDERDOG SPORTS HOLDINGS, INC.
dba UNDERDOG FANTASY;
DABBLE SPORTS, LLC;
DABBLE SPORTS PTY LTD;
BLAZESOFT LTD;
BLAZEGAMES, INC.;
SCPS LLC
dba ZULA CASINO

                                                                  DEFENDANTS

*        *        *        *        *

Plaintiff Kentucky Gambling Recovery LLC brings this action against Underdog Sports Holdings, Inc., dba Underdog Fantasy; Dabble Sports LLC; Dabble Sports Pty LTD; Blazesoft, Ltd.; Blazegames, Inc.; and SCPS LLC, dba Zula Casino (collectively, "Defendants") for recovery of gambling losses under the Statute of Anne, KRS § 372.040. Plaintiff alleges as follows:

### INTRODUCTION

1.        Kentucky ("the Commonwealth") comprehensively regulates gambling-related activities within its borders. To protect its residents from predatory and financially destructive gambling enterprises, it has prescribed exacting civil and criminal penalties on all those who would seek to sidestep that regulatory regime. For most, the threat of those penalties is deterrence enough. But not for all. Lured by the tremendous wealth of the Kentucky market, two groups of companies have offered illegal, unregulated gambling products to Kentucky residents.

AMC : 000001 of 000027

2.      The first group has, within the statute of limitations period, offered a gambling product called "Pick'ems." Hiding behind the monicker of "fantasy sports," Pick'ems allow individuals to bet against the house on the future performance of professional athletes. Specifically, they allow gamblers to place what sports books and casinos refer to as "prop bet parlays." Pick'ems are sports betting by any other name. They are prohibited in Kentucky.

3.      The second group operates a gambling product called "Sweepstakes Casinos." These platforms allow Kentucky residents to play traditional casino games—such as slots, blackjack, craps, and more—for real money. They do so behind the thinnest of legal veneers. Utilizing a two-tiered currency system, they permit users to play free games using worthless tokens, often called "Gold Coins." They then allow those same users to purchase a second currency, usually called "Sweeps Coins," with real U.S. dollars. Games played using Sweeps Coins can pay out in additional Sweeps Coins. And Sweeps Coins can be cashed out, into U.S. dollars—usually at a precisely 1:1 exchange rate.

4.      Both Pick'ems and Sweepstakes Casinos have come under legal fire. State Attorneys General and regulators have criminally investigated and have issued cease-and-desist letters to those businesses on the grounds that they offer illegal, unregulated gambling products. Private parties have filed lawsuits in state and federal court, making essentially the same allegations. And the early returns from those efforts paint a grim picture for the future of unregulated Pick'ems and Sweepstakes Casinos in the United States.

5.      The Commonwealth of Kentucky has not yet entered the fray. But it does not need to. Like many States, Kentucky offers an additional safeguard against illegal, unregulated gambling: the Statute of Anne. Based on a 1710 British law passed during the reign of Queen Anne, that law makes certain gambling debts unenforceable. It allows a losing party to sue the

2

winning party for the value of losses exceeding $5 at one time (or over the course of 24 hours). And should the losing party fail to sue within six months, it authorizes anyone to bring a claim against the winning party for three times the amount of damages (and costs).

6.    Defendants have operated in Kentucky without regard to the Commonwealth's legal limits for years. Each year, they take tens of millions of dollars from Kentucky gamblers. But under the Statute of Anne, each time Defendants caused a gambler in Kentucky to suffer gambling losses of at least $5 at one time (or over the course of 24 hours), that person had the right to sue under the Statute of Anne within six months to recover for his or her losses, plus costs. And after those six months, *any* person may sue for three times the amount of each gambler's unrecovered losses, receiving half as a relator's fee, and sharing the other half with the County in which the gambling injury occurred. In filing this action, Plaintiff does just that.

## PARTIES

7.    Plaintiff Kentucky Gambling Recovery LLC is a company formed under the laws of Delaware to enforce Kentucky's gambling laws. Its mailing address is 1700 S MacDill Ave, Suite 300, Tampa, FL 33629. Plaintiff has no relationship to any gambler who has suffered gambling losses and has not colluded with any gamblers in bringing this action.

8.    On information and belief, Defendant Underdog Sports Holdings, Inc., dba Underdog Fantasy ("Underdog") is a Delaware corporation based in New York. It has operated an unlawful, unregulated sports betting website and mobile app accessible within Kentucky and regularly used by Kentucky residents.

9.    On information and belief, Defendant Dabble Sports, LLC ("Dabble) is a Delaware corporation based in Austin, Texas. It has operated an unlawful, unregulated sports betting website and mobile app accessible within Kentucky and regularly used by Kentucky residents.

10.     On information and belief, Dabble Sports Pty LTD Is an Australian corporation based in Darwin, Australia.  It is the parent company of Dabble Sports, LLC, and through it operates an unlawful, unregulated sports betting website and mobile app accessible within Kentucky and regularly used by Kentucky residents.

11.     On information and belief, Defendant Blazesoft Ltd. ("Blazesoft") is a Canadian corporation based in Ontario, Canada.  It operates unlawful, unregulated online casinos that are accessible within Kentucky and that are regularly used by Kentucky residents.

12.     On information and belief, Defendant Blazegames, Inc. ("Blazegames") is a Delaware corporation based in Ontario, Canada.  Blazegames is owned and operated by Blazesoft and operates SCPS LLC, dba Zula Casino.  Through those subsidiaries, it operates unlawful, unregulated online casinos that are accessible within Kentucky and that are regularly used by Kentucky residents.

13.     On information and belief, SCPS LLC, dba Zula Casino ("Zula"), is a Delaware corporation based in Delaware.  Zula is owned and operated by Blazesoft.  Zula operates unlawful, unregulated online casinos that are accessible within Kentucky and that are regularly used by Kentucky residents.

14.     On information and belief, Defendants are each "winner[s]" at gaming within the meaning of the Statute of Anne, KRS. § 372.040. On information and belief, each regularly causes Kentucky residents to suffer gambling losses in excess of $5 at one time (or over the course of 24 hours).

<div align="center"><strong>JURISDICTION AND VENUE</strong></div>

15.     This case arises under KRS § 372.040.

16.     This Court has jurisdiction over the subject matter of this case pursuant to Ky. Const. § 112(5) , and KRS § 23A.010.

4

B610F665-A577-4843-B393-9E26CB349B97 : 000004 of 000067

AMC : 000004 of 000027

17.     This Court has personal jurisdiction over the Defendants under KRS § 454.210. Each of the Defendants transacts substantial business in the Commonwealth, has purposefully directed its activities at residents of the Commonwealth, and has purposefully availed itself of the benefits of the Commonwealth's laws.

18.     Plaintiff is a Delaware resident and its claims against Defendants arise out of, relate to, and have a substantial connection with business purposefully transacted by Defendants in Kentucky.

19.     Venue is proper in Kentucky because, among other things, the conduct underlying Plaintiff's claims occurred in Kentucky.

## STATEMENT OF THE FACTS

### I.     KENTUCKY'S STATUTE OF ANNE ALLOWS PRIVATE PARTIES TO SUE FOR ILLEGAL GAMBLING.

20.     While the specific conduct animating this lawsuit is recent, the cause of action animating it is not. It traces its roots to the twilight of the House of Stuart, when Queen Anne adopted what would become known as the Statute of Anne of 1710. That law had two main elements. The first declared a wide range of gambling transactions void (in effect, freeing the losing party from any obligation to pay the winner). The second created causes of action to claw back gambling gains. Those who lost at least "the Sum or Value of ten Pounds" could sue the winner to recover the amount they lost, along "with Co[s]ts of Suit." And should the losing party fail to initiate that recovery suit within three months without just cause, any other person could bring a suit against the winning party for treble damages, with half going to the person suing "the other Moiety to the u[s]e of the Poor of the Pari[s]h." Resembling the modern *qui tam* action, this last provision deputized the public to serve as private Attorneys General. It also offered a financial incentive to induce them to investigate and pursue claims against gamblers.

21.     Kentucky's own statute operates in much the same way. It provides that "[i]f any person loses to another at one (1) time, or within twenty-four (24) hours, five dollars ($5) or more," the loser "may recover it . . . by action brought within five (5) years after the payment, transfer or delivery." KRS § 372.020. And "[i]f the loser or his creditor does not, within six (6) months after its payment or delivery to the winner, sue for the money or thing lost, and prosecute the suit to recovery with due diligence, any other person may sue the winner, and recover treble the value of the money or thing lost, if suit is brought within five (5) years from the delivery or payment." *Id.* § 372.040.

22.     Gambling is closely regulated in Kentucky. The Commonwealth offers sports betting—but only via regulated and licensed vendors. *See id.* §§ 230.805, 230.808. All other "[s]ports wagering shall not be offered." *Id.* § 230.805(2). Kentucky requires that "[s]ports wagering licensees and service providers that accept wagers online via websites and mobile applications" satisfy various conditions. *Id.* § 230.805(3). No Defendant in this case is licensed under that regime. The Commonwealth broadly prohibits other sorts of gambling, making it a crime to "knowingly advance[] or profits from unlawful gambling activity." KRS § 528.030. And it is an aggravated crime to "[r]eceiv[e] in connection with a lottery … [m]ore than $500 in any one day of money played in the scheme or enterprise." *Id.* § 528.020. The Commonwealth does not permit, and has never permitted, online casinos.

23.     Defendants in this case have provided gambling offerings that fly in the face of those regulations. In filing this action, Plaintiff sues to recover the ill-gotten gains obtained by Defendants from their unlawful offerings: Pick'ems and Sweepstakes Casinos.

## II.     PICK'EMS VIOLATE KENTUCKY LAW.

24.     Unregulated sports betting is illegal in Kentucky. But certain Defendants have disregarded that prohibition, offering within the Commonwealth a product typically called

6

B610F665-A577-4843-B393-9E26CB349B97 : 000006 of 000067

AMC : 000006 of 000027

"Pick'ems." Pick'ems purport to be a variant of fantasy sports. But in truth, they are no more than a rebranding of otherwise illegal, unregulated prop-bet parlays (against the house) on the future performance of individual professional athletes. Pick'ems are not authorized under Kentucky law. Accordingly, Plaintiff may sue for the uncollected losses Pick'em daily fantasy sports ("Pick'em DFS") Defendants have inflicted on the people of Kentucky within the statute of limitations period.

### A.  FANTASY SPORTS BEGIN AS AN INNOCENT COMPETITION BETWEEN FRIENDS AND FAMILY.

25.     Fantasy sports have existed since at least 1962 when—in a crowded New York hotel room—Raiders-minority-owner Bill Winkenbach developed a season-long "fantasy football" contest. His basic idea was simple: Contestants would join fantasy "leagues" where they would compete against one another. Before each football season, those leagues would hold "drafts," with contestants taking turns selecting real-life football players to "play" for their personal teams. During the season, contestants receive fantasy points based on the in-game accomplishments of the football players they selected. And at the end of the season, the contestant with the most fantasy points wins. Winkenbach's friends liked the idea, and so the Greater Oakland Professional Pigskin Prognosticators League (or "GOPPPL") was born.

26.     It took almost ten years for this idea to reach the public, when Andy Mousalimas— a founding father of GOPPL—launched the first *public* fantasy football league at his bar, King's X. The concept of fantasy sports spread by word of mouth from there. By the 1980s, over a million fans each year participated in fantasy leagues nationwide. And the concept soon spread beyond football. Leagues sprouted up for basketball, hockey, soccer, and countless other sports, games, and athletic competitions. Some leagues played for cash, with the lion's share of the entry fees going to the winner or winners. Others played for prizes, for bragging rights, or simply for the relief of not finishing in last place.

27. With the rise of the internet, fantasy sports exploded in popularity. And what began as competitions among friends, family, and co-workers soon stretched to competitions of a global scale. In 1997, CBS became the first media company to host fantasy football leagues on its webpage. ESPN and other rival media companies followed suit. This arrangement proved mutually beneficial. Fans from around the world could compete against each other in digital leagues. And media companies profited from the increased foot traffic, with many creating content teams dedicated to discussing the "fantasy" aspect of sports.

### B. DAILY FANTASY SPORTS EMERGE, RAISING PROP-BETTING CONCERNS.

28. Eventually, fans grew impatient with having to wait an entire season to see results. So in the early 2000s, certain companies premiered a new product offering, known as Daily Fantasy Sports ("DFS"). In many respects, this initial DFS offering ("Traditional DFS") closely tracked the season-long fantasy sports offerings that came before: DFS companies would host real-time competitions between individuals. Competitors would score points in those competitions based on the real-life athletic performance of the athletes they select. At the end of the competition, the fan (or sometimes fans) with the most points wins.

29. Unlike season-long fantasy sports, Traditional DFS competitions are short-lived— usually lasting just a day, a few days, or a week. They also employ a more commercial model. Usually, Traditional DFS providers charge an entry fee to compete in their contests. A portion of that fee goes towards paying the league winner (or winners). The rest goes to the Traditional DFS provider and is sometimes called a "rake."

30. This Traditional DFS product stood on shaky legal ground. Participants stood to win or lose money based on the on-field performance of individual athletes. In that way,

B610F665-A577-4843-B393-9E26CB349B97 : 000008 of 000067

AMC : 000008 of 000027

Traditional DFS began to resemble a common fixture of sports betting: proposition bets, more commonly called "prop bets."

31.      In a prop bet, a gambler wagers on the occurrence (or non-occurrence) of a specific event during an athletic contest. For example, the gambler could wager that LeBron James will score over (or under) 25.5 points, that Saquon Barkeley will rush for over (or under) 85.5 net yards, or that Beau Brieske will have over (or under) 3.5 strikeouts. The rules are simple: If the gambler correctly guesses the result, he or she wins. Otherwise, the gambler loses the bet and the money he or she wagered.

32.      Sometimes, multiple such prop bets can be chained together into a single, larger bet called a "parlay." A parlay can contain as few as two distinct bets (sometimes called "legs") or as many as a dozen or more. At the end of the parlay, if the gambler has correctly predicted each leg of the parlay, he or she receives some multiple of his or her initial wager. The size of that multiplier is determined by how many legs the parlay had.

33.      Prop bets, with or without parlays, are quintessential sports gambling. They are prohibited in Kentucky.

34.      There is, however, a distinction between Traditional DFS offerings and prop bets: In Traditional DFS, participants compete—in real time—against other sports fans. They do not wager against lines set by professional gambling establishments. And because the contestants are (usually) all amateurs, an individual contestant knowledgeable about sports has at least *some* chance of having a statistical edge against other, less knowledgeable contestants. For example, a contestant who closely follows professional basketball could reasonably predict that Stephen Curry may score more points in an upcoming game than Ben Simmons. If matched up against less knowledgeable opponents, that contestant could seek to draft more talented players, improving his

or her odds of winning the league. That is an easier task than trying to predict whether Stephen Curry is likely to score over or under 24.5 points in an upcoming contest.

35.     Congress itself recognized this distinction. In 2006, it passed the Unlawful Internet Gambling Enforcement Act, Pub. L. No. 109–347, 120 Stat. 1952. That law added new criminal penalties for certain online wagering otherwise prohibited under state or federal law. But it excluded from its definition of gambling "participation in any fantasy or simulation sports game . . . in which," among other conditions, "[a]ll winning outcomes reflect the *relative knowledge and skill of the participants* and are determined predominantly by *accumulated statistical results of the performance of individuals* (athletes in the case of sports events) in multiple real-world sporting or other events)." 31 U.S.C. § 5362(1)(E)(ix) (emphases added). In other words, Congress created a bespoke exception in that statute narrowly tailored to cover Traditional DFS offerings.

36.     The Traditional DFS model remains popular among sports fans. Numerous such offerings are available nationwide, including in Kentucky.

### C.     PICK'EM OFFERINGS EMERGE, AND CROSS THE LINE INTO ILLEGAL SPORTS BETTING.

37.     Certain companies, however, saw a chance for still greater profit by transforming their business model to resemble that of a conventional sportsbook. To do this, they created a new offering, sometimes referred to as "Pick'em daily fantasy sports" ("Pick'em DFS"). While Pick'em DFS is sometimes labeled a subtype of daily fantasy sports, it lacks all the features that distinguish Traditional DFS from garden-variety sports betting. In Pick'em DFS, there is no real-time competition between players. Instead, gamblers place illegal, unregulated prop-bet parlays against the house. Pick'em DFS is flatly illegal under Kentucky law.

38.     The Pick'em DFS model is straightforward. Pick'em DFS companies offer individual gamblers a set of possible wagers, in the form of prop bets on individual athletes'

B610F665-A577-4B43-B393-9E26CB349B97 : 000010 of 000067

AMC : 000010 of 000027

performances in upcoming competitions. Gamblers must then select two or more of those prop

bets to form a parlay. So, using the previous examples, a gambler could create a three-legged

parlay, wagering that on a specific day of athletic competitions (1) LeBron James will score over

25.5 points; and (2) Saquon Barkeley will rush for under 85.5 net yards; and (3) Beau Brieske will

have over 3.5 strikeouts.

39.     Typically, gamblers must guess *each* leg correctly for their parlay to pay out (or

"hit"). Using the above example, if a gambler got all three legs of his parlay correct, he or she

could expect a payout of about 6x the amount of money he or she risked. But if he or she got even

one leg wrong, he or she would lose the entire amount wagered.

40.     Sometimes, Pick'em DFS companies offer modified versions of the same basic

arrangement. For example, they may allow a gambler to collect if he or she correctly guesses four

out of five legs of a parlay. However, the payout multiplier would be reduced accordingly. Those

variants do not alter the basic way Pick'em DFS companies function.

41.     To ensure they turn a profit, Pick'em DFS providers rig the math in their favor.

They do so in at least two distinct ways.

42.     *First*, Pick'em DFS companies may sometimes offer gamblers wagers that are

themselves tilted towards the house. For example, in some cases they may offer a customer the

option to wager on LeBron James scoring (1) *over* 25.5 points; or (2) *under* 23.5 points. If the

actual score is between those ranges, both sets of prop bets would fail.

43.     *Second*, Pick'em DFS companies set payout multipliers that are far too low for any

gambler, on expectation, to break even. On information and belief, they employ statisticians and

proprietary software to set betting lines that are no better than 50/50 value propositions. In setting

those lines, they use data (not widely available to gamblers) about the volume and magnitude of

B610F665-A577-4843-B393-9E26CB349B97 : 000011 of 000067

AMC : 000011 of 000027

11

bets placed on their platform and on other rival platforms. For example, if gamblers generally favor one side of a prop bet, Pick'em DFS companies can shift the betting line to induce more bets on the other side. As a result, gamblers cannot expect to pick correctly more than half the time.

44.      Pick'em DFS providers' payout structure does not keep pace with gamblers' low chance success on multi-legal parlays. On expectation, a gambler's odds of correctly guessing a two-player parlay would be 1 in 4. That same gambler's odds of correctly guessing a three-player parlay would be 1 in 8; a four-player parlay would be 1 in 16; and a five-player parlay would be 1 in 32. To break even in expected value, that gambler would therefore require payouts of *at least* 4x (for a two-player parlay), 8x (for a three-player parlay), 16x (for a four-player parlay), and 32x (for a five-player parlay). Adjusting for increased risk, the necessary payouts would need to be even higher for gamblers to break even in expected value.

45.      Pick'em companies' payouts fall well short of those marks. On information and belief, their payouts are usually at or around 3x, 6x, 10x, and 20x, respectively. This disparity ensures that, each time a gambler wagers on a Pick'em DFS offering, that gambler loses expected value. Given enough time, the Pick'em DFS provider will come out ahead.

46.      Indeed, Pick'em DFS provides an even *worse* value proposition than the traditional prop-bet parlays offered in sportsbooks. For example, one Pick'em DFS provider prominently advertised on social media a parlay in which a gambler risked $5,000 to win $50,000. However, in a traditional sports book, that same parlay would have paid out more than $100,000. In other words, the gambler placing that bet received *less than half* of the expected value that he or she would have gotten at a sportsbook.

### D. PICK'EM OFFERINGS ARE ILLEGAL, UNREGULATED SPORTS GAMBLING.

47.     Pick'em DFS offerings violate Kentucky's regulations on sports betting.  The Commonwealth requires that "[s]ports wagering licensees and service providers that accept wagers online via websites and mobile applications" satisfy various conditions, including registration.  *Id.* § 230.805(3).  Yet Pick'em DFS companies have failed to satisfy those requirements.  That sort of "[s]ports wagering shall not be offered" in Kentucky.  *Id.* § 230.805(2).  Nor can there be any doubt that their products qualify as sports wagering.  Kentucky defines a "sports wager" as a "a sum of money or representation of value that is risked on a sporting event for which the outcome is uncertain." 809 KAR 10:001(66).  That is precisely what gamblers stake when they use Pick'em DFS providers offerings.

48.     In all material respects, Pick'em DFS is indistinguishable from the prop-bet parlays bets regularly offered at sportsbooks, casinos, and other gambling establishments.  And unlike Traditional DFS, they cannot be fairly described as a game in which "[a]ll winning outcomes reflect the *relative knowledge and skill of the participants.*" 31 U.S.C. § 5362(1)(E)(ix) (emphasis added).  Rather, one participant (the gambler) bets the over/under against lines set by a professional, albeit illegal and unregulated, gambling establishment (the Pick'em DFS company).

49.     Pick'em DFS offerings are, by definition, games of luck and not games of skill.  Numerous unknowable and unpredictable factors—physical and mental variables, third parties' decision-making, and random chance—can affect a player's performance in any given competition.  And unlike Traditional DFS (where competitors can at least leverage their *comparative* knowledge of professional players against similarly situated individuals) Pick'em DFS requires gamblers to compete against over/under lines set by professional gambling

establishments, and determined with the help of special expertise, technology, and data that regular gamblers cannot readily access.

50.     Empirical analyses confirm that sports bettors struggle to establish an edge against professional oddsmakers.  And while certain gamblers come to believe otherwise, studies have confirmed those beliefs are largely the result of cognitive distortions and do not reflect a genuine skill edge over the betting platform.

51.     Even if individual gamblers can gain a slight statistical edge against the house—for example, by trading on non-public insider information—that edge is almost always insufficient to offset the reduced payouts Pick'em DFS companies offer.  As a result, it is overwhelmingly a losing proposition.  Industry insiders estimate that no more than 1-3% of sports gamblers profit over an extended time horizon.  And studies suggest that even this small cohort of successful gamblers likely owes their results to survivorship bias—the brute statistical fact that even in games with terrible odds, *somebody* must win *eventually*.

52.     Moreover, even if that small group of *individual* gamblers could profit from Pick'em DFS offerings, it would be impossible for Pick'em DFS gamblers to *collectively* beat the house.  Among other issues, Pick'em DFS companies can always adjust their betting lines to adapt to changes in gamblers' betting behavior.  Any arbitrage a savvy gambler could identify, a Pick'em DFS company could legislate away.

53.     It is no secret that Pick'em DFS offerings are illegal, unregulated sports betting. As the President of the American Gaming Association put it, Pick'em DFS offerings are merely "unlicensed sports betting masquerading as daily fantasy products."  And a long and rapidly growing list of states have caught on to the blatant illegality of Pick'em DFS offerings and have taken decisive actions against them.  Ohio and Maryland have long forbidden Pick'em DFS

offerings. Michigan, New York, Colorado, and Arizona have more recently moved against them. And Maine, Virgina, Mississippi, Arkansas, Virginia, West Virginia, Wyoming, Kansas, and Illinois have all either sent cease-and-desist letters or have issued opinion letters driving Pick'em DFS offerings out of their states. That list continues to grow. Just as Pick'em DFS offerings are illegal in each of those states, they are illegal in Kentucky too.

### E. PICK'EM COMPANIES SOLICIT SPORTS BETS FROM RESIDENTS IN KENTUCKY.

54.    Pick'em DFS providers have operated in Kentucky in plain sight—flagrantly violating Kentucky's anti-sports-betting laws. Each of the companies listed below has offered a Pick'em DFS product to residents of Kentucky within the statute of limitations period. Those Pick'em DFS Defendants' offerings in Kentucky share all the core features described above.

a. **Underdog Fantasy.** Launched in 2020, Underdog Fantasy has over 2.4 million active users. It proudly advertises on its website that it operates "pick'ems" in Kentucky. A review of its rules confirms that it operates a standard Pick'em DFS product. As one leading DFS website puts it, "Underdog . . . offer[s] the ability to wager on player props in their Pick'em-based format." That article goes on to say (emphasis added): *"Much like a sportsbook*, Pick'em allows users to parlay player props offered by the site for big payouts." Perhaps recognizing this issue, Underdog Fantasy recently withdrew its Pick'em DFS offerings from Kentucky. Yet that choice does not erase its liability for offering that product within the statute of limitations period.

b. **Dabble.** Dabble is a more recent Pick'em DFS provider currently limited to NBA betting. It has over 1 million active users. Dabble offers a "Pick'Em" optionality, which it describes "new and exciting way to bet, that focuses on player stats, and

player stats only!" Gamblers need only "pick whether a player will achieve either 'More' or 'Less' than a specific projection – giving [them] a 50/50 chance." That "Pick'Em" mode remains available in Kentucky.

55.     In addition to the details provided above, Plaintiff has independently investigated the websites and apps of the Pick'em Defendants. That investigation confirmed that each of those Defendants offered Kentucky residents the ability to place illegal, unregulated sports bets through a Pick'em DFS offering within the statute of limitations.

56.     On information and belief, Kentucky residents have gambled using each of the Pick'em DFS offerings offered by Pick'em DFS Defendants. On information and belief, Kentucky residents have (within the statute of limitations period) lost over $5 at a single time (or over the course of 24 hours) on both of those Pick'em DFS offerings and have failed to sue the Pick'em DFS Defendants under Kentucky's Statute of Anne within the statutorily prescribed six months.

### F. PICK'EM OFFERINGS HAVE INJURED KENTUCKY RESIDENTS.

57.     Business is good for Daily Fantasy Sports. The market is expected to reach a total value of $14.29 billion in 2025, up from $13.27 billion the year prior. And it is expected to grow to some $27.92 billion within the next few years. But that money has to come from somewhere. And as with other gambling products, that "somewhere" is the gamblers themselves. As noted previously, only a tiny sliver of all players—about 1% to 3%—manage to turn a profit. And even that 1% to 3% of players suffers through losing sittings (often, *multiple* losing sittings) along the way. The stakes of those losing sessions can be sky-high. Per industry studies, 5% of players wager at least $3,600 annually, and some individuals gamble $2 million or more each year on those platforms. For many Americans, that is money they cannot afford to lose.

16

B610F665-A577-4843-B393-9E26CB349B97 : 000016 of 000067

AMC : 000016 of 000027

B610F665-A577-4843-B393-9E26CB349B97 : 000017 of 000067

58.     Nor is the impact only monetary. Sports gambling addiction is rampant, fueling a crisis in public health. A recent study confirms that "DFS participants behave similarly with participants in other forms of gambling activities," and that "additional consumer protections may be needed to prevent further problem behavior such as chasing." Those "DFS players are characterized by high gambling frequency and problem severity and comorbid problems, notably suicidal ideation." And this harm is concentrated in those who opt for Pick'em DFS offerings, rather than the Traditional DFS ones describes above. Whereas Traditional DFS models played "between friends and family" can promote healthy social engagement, "[d]aily games . . . are more like gambling" and are instead linked to "higher levels of . . . online gambling" of various types."

59.     Young individuals suffer most acutely. Per one industry study, some 58% of 18- to 22-year-olds gamble on sports each year, with roughly 10% gambling on sports each week and 4% doing so daily. Sports gambling addictions can begin as early as age 10, and studies have found that between 4% and 8% suffer from problem gambling. In addition to being financially ruinous, that habit can take a severe emotional toll too. One study shows that, of problem gamblers who have sought out treatment, "between 22 and 81 percent . . . have been found to have suicidal ideations," and "between 7 and 30 percent of individuals have had suicide attempts." Pick'em DFS seek to capitalize on that worrisome trend. As the co-founder of one Pick'em DFS provider put it, the goal of the company's Pick'em DFS product is to "make sports betting cool for kids."

60.     Pick'em DFS Defendants are among the largest Pick'em DFS companies operating in the United States, and they have among the largest user bases. On information and belief, they collectively account for a sizable portion of the Pick'em-DFS-based sports betting injury suffered in Kentucky each year.

AMC : 000017 of 000027

### III.     SWEEPSTAKES CASINOS VIOLATE KENTUCKY LAW.

61.     Another set of Defendants also operate illegal, unregulated gambling operations within Kentucky: "Sweepstakes Casinos." These digital platforms allow Kentucky residents to gamble on typical casino games (including slots, blackjack, and craps) using a digital token that can be purchased with, and freely exchanged into, U.S. Dollars—typically at a 1:1 exchange rate. Sweepstakes casinos violate Kentucky's prohibitions on video gambling. And they can cause Kentucky residents to sustain massive losses each year.

#### A.     SWEEPSTAKES CASINOS ARE AN ATTEMPTED END-RUN AROUND KENTUCKY'S PROHIBITION ON ONLINE CASINOS.

62.     Nationwide, only seven U.S. states permit real-money online casino gaming. Kentucky is not one on that list. The Commonwealth broadly criminalizes "knowingly advanc[ing] or profit[ing] from unlawful gambling activity," KRS § 528.030, and makes it a first-degree offense to "[r]eceiv[e] in connection with a lottery … [m]ore than $500 in any one day of money played in the scheme or enterprise," *id.* § 528.020. The Commonwealth does not currently, and has never, licensed online casinos. Sweepstakes Casinos are no more than an attempted end-run around Kentucky's clear prohibition on online casino gambling.

63.     For all their apparent complication, the basic operation of Sweepstakes Casinos is straightforward. They operate using a "two-tiered" currency system. Upon signing up, new members receive a quantity of virtual tokens, typically called "Gold Coins." Gamblers then get additional Gold Coins periodically, for various reasons. For example, they may receive Gold Coins for logging on, completing certain objectives, or hitting membership milestones. Gamblers can use Gold Coins to play free versions of traditional casino games—for example, slots, blackjack, craps, and roulette. However, none of those games give prizes redeemable outside the website. Nor can gamblers convert their Gold Coins into cash, directly or indirectly.

B610F665-A577-4843-B393-8E26CB349B97 : 000018 of 000067

AMC : 000018 of 000027

64.     However, once gamblers have signed up, they can purchase a secondary currency: a virtual token usually called "Sweeps Coins." Like Gold Coins, Sweeps Coins can be used to play customary casino games. But unlike Gold Coins, games purchased with Sweeps Coins come with real stakes. Gamblers can win (and lose) Sweeps Coins. And gamblers can exchange their Sweeps Coins for real-life prizes or can cash them out for real U.S. dollars.

65.     In all relevant respects, Sweeps Coins are merely a placeholder token for real currency. In that way, they are identical to the gambling chips widely used in brick-and-mortar casinos across the country. Upon entering a physical casino, gamblers can exchange their real money for "chips." They can then use those chips to place wagers on a variety of games in the casino. When the gamblers leave, they can cash out their chips, reverting them back to regular currency. Sweeps Coins work in precisely the same way.

66.     To conceal their business model, Sweepstakes Casinos insist that they do not actually allow gamblers to purchase Sweeps Coins. Instead, they say, they offer a "sweepstake." And to keep up this ruse, they will usually only permit gamblers to purchase "bundles" which include *both* an (arbitrary) amount of Gold Coins and a (not-arbitrary) amount of Sweeps Coins. This sleight-of-hand, however, changes nothing.

67.     On information and belief, Gold Coins have zero (or close to zero) economic value. If gamblers only wish to play free casino games, they can do so with the supply of free Gold Coins they regularly receive. Should they run out, they can create a new (free) account on the same Sweepstakes Casinos or on a rival Sweepstakes Casino. And of course, they can play materially identical games (for free) on countless other online platforms, without any associated Gold Coin requirement. Given all those options, it defies credulity to believe gamblers would purchase bundles for the purpose of procuring Gold Coins.

B610F665-A577-4843-B393-9E26CB349B97 : 000020 of 000067

68.　　　On information and belief, Sweepstakes Casinos know that gamblers purchase those bundles only for the Sweeps Coins. And various features of Sweepstakes Casinos' business operations confirm as much.

69.　　　*First*, gamblers can almost always purchase Sweeps Coins at exactly a 1:1 (or nearly 1:1) conversion rate. To induce larger purchasers, Sweepstakes Casinos sometimes offer slightly better deals in bulk—for example, $1,000 may get a gambler 1,050 Sweeps Coins, rather than 1,000. But this is just a disguised cash inducement for gamblers to invest in the platform. As a recent article points out, this "nearly 1:1 correlation between Sweeps Coins and dollars spent is so commonplace that one prominent sweepstakes affiliate admitted that it basically 'gives you the same amount of free sweeps coins for your payment (like paying $30 for 30 free sweeps).'"

70.　　　*Second*, gamblers can almost always cash out their Sweeps Coins for U.S. dollars at precisely a 1:1 conversion rate. In this way, they operate as a perfect stand-in for real currency. This is intentional. Sweepstakes Casinos could have set any conversion rate they pleased. But by opting for a rate at near 1:1, they make it easy for gamblers to understand precisely how much—in real dollars—is on the line when they gamble. On information and belief, this can enhance the experience for gamblers, who seek the thrill of winning real money.

71.　　　*Third*, as a recent article notes, this 1:1 conversion rate becomes especially striking "when juxtaposed against the astronomically high number of Gold Coins received relative to dollars spent," a rate which can "exceed 10:000:1 in many cases." In truth, the ratio of Gold Coins to dollars spent could just as easily be 1,000,000,000:1. As noted above, Gold Coins have no economic value. On information and belief, gamblers purchase packages containing both Gold Coins and Sweeps Coins because—and *only* because—they contain Sweeps Coins. And on

AMC : 000020 of 000027

20

information and belief, those same gamblers seek Sweeps Coins because—and *only* because—they permit the gamblers to engage in real-cash online gambling, in violation of state law.

72.     *Fourth*, Sweepstakes Casinos' advertising and promotional materials show that they understand consumers value only Sweeps Coins.  For example, many of their websites take pains to emphasize not *all* their bundles contain Sweeps Coins.  But of course, the fact that Sweepstakes Casinos make it *possible* to purchase Gold Coins in isolation does not mean that real customers choose to do so on any meaningful scale.  The inclusion of this language is instead a cynical effort to throw regulators off their tails.

73.     Similarly, Sweepstakes Casinos will make a small number of Sweeps Coins available without purchase.  They usually gift a small starting amount of Sweeps Coins as a sign-up bonus—a move to induce new individuals to sign up.  They may also gift some Sweeps Coins when gamblers link their social media accounts to their website, making it easier for the Sweepstakes Casino to send them and their friends targeted ads.  And Sweepstakes Casinos sometimes offer a small amount of Sweeps Coins to gamblers who complete pointless, convoluted, or little-advertised tasks—for example, filling out a mail-in form noted only in the website's fine print.  But through these tasks, according to one recent article, users ordinarily "can receive [only] a limited number of Sweeps Coins (usually no more than 5)."  "[B]y far the most common way to obtain Sweeps Coins beyond a nominal amount is by purchasing Gold Coins."  And these gifts are in fact no gifts at all.  Sweepstakes Casinos know that, given enough time, they will eventually win this money back (and, if the gambler sticks around on their platform, they will win much more).

### B.     SWEEPSTAKES CASINOS OPERATE IN KENTUCKY.

74.     Sweepstakes Casinos operate openly within Kentucky ("Sweepstakes Defendants").  The most prominent of these is the collection of companies associated with the

Blazesoft product. Blazesoft operates Zula Casino, which boasts of offering a "wide array of popular casino-style games." Zula Casino is a self-described Sweepstakes Casino that uses the customary two-tier currency system, with "Gold Goins" and "Sweeps Coins." Zula Casino operates in Kentucky.

75.     Plaintiff has independently investigated the websites and apps of the Sweepstakes Defendants listed in this Complaint. That investigation confirmed that each of those Defendants have (within the statute of limitations period) offered Kentucky residents the ability to place illegal, unregulated sports bets through a Sweepstakes Casino offering.

76.     On information and belief, Kentucky residents have gambled using the Sweepstakes Casino offerings controlled by Sweepstakes Defendants. On information and belief, Kentucky residents have (within the statute of limitations period) lost over $5 at a single time (or over the course of 24 hours) on their offerings and have failed to sue the Sweepstakes Defendants under Kentucky's Statute of Anne within the statutorily prescribed six months.

### C.     SWEEPSTAKES CASINOS ARE ILLEGAL GAMBLING.

77.     Sweepstakes Defendants unequivocally operate illegal gambling operations in Kentucky. As noted above, online casinos are prohibited under various provisions of Kentucky law. And in all relevant respects, Sweepstakes Casinos are indistinguishable from online casinos that this Commonwealth has long forbidden.

78.     To start, there is no doubt that the games they offer—slots, blackjack, craps, and others—are games of chance. Indeed, Sweepstakes Defendants take pride in mimicking the offerings that gamblers could find at a casino. Some of their advertising seeks to emphasize that overlap. Nor is there any doubt that the games involving Sweeps Coins are played for prizes. Not only can Sweeps Coins be redeemed for real-life prizes, but they can also be cashed in for U.S. dollars. That, too, is quintessential gambling.

22

79.    Sweepstakes Defendants thus stake their continued operation *entirely* on the theory that there is no legal "consideration"—that is, that gamblers do not wager anything of value provided by them in exchange for the chance to win. But that requires this Court accepting the incredible suggestion that gamblers do not really purchase Sweeps Coins, *only* Gold Coins. For the reasons outlined above, that strains belief, defies basic logic, runs contrary to the expressed positions of both gamblers and industry experts, and is inconsistent with the revealed preferences of the very gamblers Sweepstakes Defendants take money from.

80.    Nor are others falling for Sweepstakes Defendants' inartful ruse. Across the Country, a growing number of state Attorneys General and state regulators—including those in Arizona, Connecticut, Delaware, Maryland, Michigan, and Pennsylvania—have moved against Sweepstakes Casinos (including Sweepstakes Defendants) in the form of criminal investigations and cease-and-desist letters. Other states are currently contemplating action of their own. Sweepstakes Defendants (and other companies like Sweepstakes Defendants) have collectively been hit with over a dozen class actions by private parties. And as a recent article summarizes, across the Country, "every relevant judicial decision . . . which addresses a 'casino-style' sweepstakes game that awards users entries to play real money games of chance in an amount commensurate with dollars spent was found to be illegal gambling," regardless of whether "free entries were also available without a product purchase."

81.    This Court should join this nationwide consensus by finding the obvious: Sweepstakes Defendants' offerings *look* like online casinos because they *are* online casinos. And online casinos are not permitted under Kentucky law. Because Sweepstakes Defendants' offerings are illegal, unregulated gambling operations within the Commonwealth, Plaintiff can sue to

recover the total amount of unclaimed losses suffered by Kentucky residents on Sweepstakes Defendants' platforms within the statute of limitations period.

### D.     SWEEPSTAKES CASINOS INJURE KENTUCKY RESIDENTS.

82.     Sweepstakes Casinos have grown tenfold over the last five years. As of 2025 they bring in over $8 billion annually. But as with other gambling operations, that money comes from one main source: gamblers. And the individual losses at Sweepstakes Casinos can be enormous. A recent criminal investigation in Connecticut against Defendant High 5 Casino revealed that a group of just 911 Connecticut gamblers alone lost, collectively, $937,938. Because Kentucky has a larger population than Connecticut, there is good reason to believe Kentucky residents have suffered at least a comparable (if not greater) total loss. And over the course of countless individual sittings, their total losses undoubtedly eclipse that figure.

83.     Sweepstakes Casinos are also dangerously addictive—above and beyond even other gambling offerings. They remove many of the barriers that guard against compulsive in-person gambling: for instance, the need to physically travel to a casino, and the need to exchange more money for chips. And the bombardment of visual and auditory stimulation on online casinos—combined with the high pace of the games—creates a uniquely dopamine-rich environment that has been shown to enhance addictive potential.

84.     Moreover, the fact that Sweepstakes Casinos masquerade as non-gambling products presents other risks. They lure in individuals ill-equipped for their business model. They also bait in individuals already suffering from gambling addictions, circumventing critical public health safeguards. For example, of the subgroup of the 911 Connecticut gamblers discussed above, 108 had previously registered for that state's Voluntary Self-Exclusion List. Many Kentucky residents are similarly endeavoring to stop online gambling. Sweepstakes Casinos are yet one more obstacle standing in the way of that goal.

24

B610F665-A577-4843-B393-9E26CB349B97 : 000024 of 000067

AMC : 000024 of 000027

85.     Sweepstakes Defendants are among the largest Sweepstakes Casinos operating in the United States and have among the largest user bases.  On information and belief, they collectively account for a sizable portion of the Sweepstakes-Casino-based gambling injury suffered in Kentucky each year.

## COUNT I
### (Claim under KRS § 372.040)

86.     Plaintiff brings this count against all Defendants under the Statute of Anne, KRS § 372.040.

87.     Upon information and belief, thousands of individuals within Kentucky have lost—and continue to lose—more than $5 at any single time (or over 24 hours) by gambling with Defendants, and have not sued to recover those losses within six months of payment to Defendants. The identity and precise number of such gamblers ("Gambling Victims") is within the unique possession of Defendants.

88.     Defendants are gambling "winner[s]" within the meaning of KRS § 372.040.

89.     Plaintiff qualifies as a "person" authorized to sue for the recovery losses at gaming within the meaning of KRS § 372.040.  Plaintiff has not colluded with any Gambling Victims in bringing this action.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment against Defendant and respectfully requests that the Court grant the following relief:

A.  Declaring that the Defendants are liable under the Statute of Anne, KRS § 372.040;

B610F665-A577-4843-B393-9E26CB349B97 : 000025 of 000067

AMC : 000025 of 000027

B.  Awarding eligible damages, continuing until the time of final judgment, based on three times the value of the money, goods, chattels, or other things lost to Defendants at gambling;

C.  Awarding the costs of prosecuting this action, including reasonable attorney's fees, experts' fees, and litigation costs together with interest;

D.  Awarding pre- and post-judgment interest as allowed by law; and

E.  Granting such other relief as the Court deems proper.

B610F665-A577-4843-B393-9E26CB349B97 : 000026 of 000067

AMC : 000026 of 000027

Dated:  October 28, 2025

Respectfully submitted,

*/s/ Grace E. L. Greenwell*

Grace E. L. Greenwell
graceg@bccnlaw.com
BAHE COOK CANTLEY & NEFZGER PLC
1041 Goss Avenue
Louisville, Kentucky 40217
(502) 587-2002 – Telephone
(502) 587-2006 – Facsimile

Derek T. Ho (*pro hac, pending*)
Kyle B. Grigel (*pro hac, pending*)
KELLOGG, HANSEN, TODD, FIGEL &
  FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel: (202) 326-7900
Fax: (202) 326-7999
dho@kellogghansen.com
kgrigel@kellogghansen.com

*Counsel for Plaintiff*

B610F665-A577-4843-B393-9E26CB349B97 : 000027 of 000067

AMC : 000027 of 000027

COMMONWEALTH OF KENTUCKY
FRANKLIN CIRCUIT COURT
DIVISION ____
CIVIL ACTION NO. _____

KENTUCKY GAMBLING RECOVERY LLC                    PLAINTIFF

v.                              **COMPLAINT**

UNDERDOG SPORTS HOLDINGS, INC.
dba UNDERDOG FANTASY;
DABBLE SPORTS, LLC;
DABBLE SPORTS PAY LTD;
BLAZESOFT LTD;
BLAZEGAMES, INC.;
SCPS LLC
dba ZULA CASINO

                                               DEFENDANTS

\*  ·      \*      \*      \*      \*

    Plaintiff Kentucky Gambling Recovery LLC brings this action against Underdog Sports

Holdings, Inc., dba Underdog Fantasy; Dabble Sports LLC; Dabble Sports Pay LTD; Blazesoft,

Ltd.; Blazegames, Inc.; and SCPS LLC, dba Zula Casino (collectively, "Defendants") for recovery

of gambling losses under the Statute of Anne, KRS § 372.040. Plaintiff alleges as follows:

### INTRODUCTION

    1.    Kentucky ("the State") comprehensively regulates gambling-related activities

within its borders. To protect its residents from predatory and financially destructive gambling

enterprises, it has prescribed exacting civil and criminal penalties on all those who would seek to

sidestep that regulatory regime. For most, the threat of those penalties is deterrence enough. But

not for all. Lured by the tremendous wealth of the Kentucky market, two groups of companies

have offered illegal, unregulated gambling products to Kentucky residents.

Presiding Judge: HON. PHILLIP J. SHEPHERD (648260)

Package : 000001 of 000024

2.　　　The first group has, within the statute of limitations period, offered a gambling product called "Pick'ems." Hiding behind the monicker of "fantasy sports," Pick'ems allow individuals to bet against the house on the future performance of professional athletes. Specifically, they allow gamblers to place what sports books and casinos refer to as "prop bet parlays." Pick'ems are sports betting by any other name. They are prohibited in Kentucky.

3.　　　The second group operates a gambling product called "Sweepstakes Casinos." These platforms allow Kentucky residents to play traditional casino games—such as slots, blackjack, craps, and more—for real money. They do so behind the thinnest of legal veneers. Utilizing a two-tiered currency system, they permit users to play free games using worthless tokens, often called "Gold Coins." They then allow those same users to purchase a second currency, usually called "Sweeps Coins," with real U.S. dollars. Games played using Sweeps Coins can pay out in additional Sweeps Coins. And Sweeps Coins can be cashed out, into U.S. dollars—usually at a precisely 1:1 exchange rate.

4.　　　Both Pick'ems and Sweepstakes Casinos have come under legal fire. State Attorneys General and regulators have criminally investigated and have issued cease-and-desist letters to those businesses on the grounds that they offer illegal, unregulated gambling products. Private parties have filed lawsuits in state and federal court, making essentially the same allegations. And the early returns from those efforts paint a grim picture for the future of unregulated Pick'ems and Sweepstakes Casinos in the United States.

5.　　　The State of Kentucky has not yet entered the fray. But it does not need to. Like many States, Kentucky offers an additional safeguard against illegal, unregulated gambling: the Statute of Anne. Based on a 1710 British law passed during the reign of Queen Anne, that law makes certain gambling debts unenforceable. It allows a losing party to sue the winning party for

2

the value of losses exceeding $5 at one time (or over the course of 24 hours). And should the losing party fail to sue within six months, it authorizes anyone to bring a claim against the winning party for three times the amount of damages (and costs).

6.     Defendants have operated in Kentucky without regard to the State's legal limits for years. Each year, they take tens of millions of dollars from Kentucky gamblers. But under the Statute of Anne, each time Defendants caused a gambler in Kentucky to suffer gambling losses of at least $5 at one time (or over the course of 24 hours), that person had the right to sue under the Statute of Anne within six months to recover for his or her losses, plus costs. And after those six months, *any* person may sue for three times the amount of each gambler's unrecovered losses, receiving half as a relator's fee, and sharing the other half with the County in which the gambling injury occurred. In filing this action, Plaintiff does just that.

<div align="center">

**PARTIES**

</div>

7.     Plaintiff Kentucky Gambling Recovery LLC is a company formed under the laws of Delaware to enforce Kentucky's gambling laws. Its mailing address is 1700 S MacDill Ave, Suite 300, Tampa, FL 33629. Plaintiff has no relationship to any gambler who has suffered gambling losses and has not colluded with any gamblers in bringing this action.

8.     On information and belief, Defendant Underdog Sports Holdings, Inc., dba Underdog Fantasy ("Underdog") is a Delaware corporation based in New York. It has operated an unlawful, unregulated sports betting website and mobile app accessible within Kentucky and regularly used by Kentucky residents.

9.     On information and belief, Defendant Dabble Sports, LLC ("Dabble) is a Delaware corporation based in Austin, Texas. It has operated an unlawful, unregulated sports betting website and mobile app accessible within Kentucky and regularly used by Kentucky residents.

<div align="center">

3

</div>

10.      On information and belief, Dabble Sports Pty Ltd. Is an Australian corporation based in Darwin, Australia. It is the parent company of Dabble Sports, LLC, and through it operates an unlawful, unregulated sports betting website and mobile app accessible within Kentucky and regularly used by Kentucky residents.

11.      On information and belief, Defendant Blazesoft Ltd. ("Blazesoft") is a Canadian corporation based in Ontario, Canada. It operates unlawful, unregulated online casinos that are accessible within Kentucky and that are regularly used by Kentucky residents.

12.      On information and belief, Defendant Blazegames, Inc. ("Blazegames") is a Delaware corporation based in Ontario, Canada. Blazegames is owned and operated by Blazesoft and operates SCPS LLC, dba Zula Casino. Through those subsidiaries, it operates unlawful, unregulated online casinos that are accessible within Kentucky and that are regularly used by Kentucky residents.

13.      On information and belief, SCPS LLC, dba Zula Casino ("Zula"), is a Delaware corporation based in Delaware. Zula is owned and operated by Blazesoft. Zula operates unlawful, unregulated online casinos that are accessible within Kentucky and that are regularly used by Kentucky residents.

14.      On information and belief, Defendants are each "winner[s]" at gaming within the meaning of the Statute of Anne, KRS. § 372.040. On information and belief, each regularly causes Kentucky residents to suffer gambling losses in excess of $5 at one time (or over the course of 24 hours).

## JURISDICTION AND VENUE

15.      This case arises under KRS § 372.040.

16.      This Court has jurisdiction over the subject matter of this case pursuant to Ky. Const. § 112(5) , and KRS § 23A.010.

4

17.     This Court has personal jurisdiction over the Defendants under KRS § 454.210. Each of the Defendants transacts substantial business in the State, has purposefully directed its activities at residents of the State, and has purposefully availed itself of the benefits of the State's laws.

18.     Plaintiff is a Delaware resident and its claims against Defendants arise out of, relate to, and have a substantial connection with business purposefully transacted by Defendants in Kentucky.

19.     Venue is proper in Kentucky because, among other things, the conduct underlying Plaintiff's claims occurred in Kentucky.

## STATEMENT OF THE FACTS

### I.     KENTUCKY'S STATUTE OF ANNE ALLOWS PRIVATE PARTIES TO SUE FOR ILLEGAL GAMBLING.

20.     While the specific conduct animating this lawsuit is recent, the cause of action animating it is not. It traces its roots to the twilight of the House of Stuart, when Queen Anne adopted what would become known as the Statute of Anne of 1710. That law had two main elements. The first declared a wide range of gambling transactions void (in effect, freeing the losing party from any obligation to pay the winner). The second created causes of action to claw back gambling gains. Those who lost at least "the Sum or Value of ten Pounds" could sue the winner to recover the amount they lost, along "with Co[s]ts of Suit." And should the losing party fail to initiate that recovery suit within three months without just cause, any other person could bring a suit against the winning party for treble damages, with half going to the person suing "the other Moiety to the u[s]e of the Poor of the Pari[s]h." Resembling the modern *qui tam* action, this last provision deputized the public to serve as private Attorneys General. It also offered a financial incentive to induce them to investigate and pursue claims against gamblers.

5

21.     Kentucky's own statute operates in much the same way.  It provides that "[i]f any person loses to another at one (1) time, or within twenty-four (24) hours, five dollars ($5) or more," the loser "may recover it . . . by action brought within five (50 years after the payment, transfer or delivery." KRS § 372.020.  And "[i]f the loser or his creditor does not, within six (6) months after its payment or delivery to the winner, sue for the money or thing lost, and prosecute the suit to recovery with due diligence, any other person may sue the winner, and recover treble the value of the money or thing lost, if suit is brought within five (5) years from the delivery or payment." *Id.* § 372.040.

22.     Gambling is closely regulated in Kentucky.  The State offers sports betting—but only via regulated and licensed vendors. *See id.* §§ 230.805, 230.808.  All other "[s]ports wagering shall not be offered." *Id.* § 230.805(2).  Kentucky requires that "[s]ports wagering licensees and service providers that accept wagers online via websites and mobile applications" satisfy various conditions. *Id.* § 230.805(3).  No Defendant in this case is licensed under that regime.  The State broadly prohibits other sorts of gambling, making it a crime to "knowingly advance[] or profits from unlawful gambling activity." KRS § 528.030.  And it is an aggravated crime to "[r]eceiv[e] in connection with a lottery … [m]ore than $500 in any one day of money played in the scheme or enterprise." *Id.* § 528.020.  The State does not permit, and has never permitted, online casinos.

23.     Defendants in this case have provided gambling offerings that fly in the face of those regulations.  In filing this action, Plaintiff sues to recover the ill-gotten gains obtained by Defendants from their unlawful offerings:  Pick'ems and Sweepstakes Casinos.

## II.     PICK'EMS VIOLATE KENTUCKY LAW.

24.     Unregulated sports betting is illegal in Kentucky.  But certain Defendants have disregarded that prohibition, offering within the State a product typically called "Pick'ems." Pick'ems purport to be a variant of fantasy sports.  But in truth, they are no more than a rebranding

6

of otherwise illegal, unregulated prop-bet parlays (against the house) on the future performance of individual professional athletes. Pick'ems are not authorized under Kentucky law. Accordingly, Plaintiff may sue for the uncollected losses Pick'em daily fantasy sports ("Pick'em DFS") Defendants have inflicted on the people of Kentucky within the statute of limitations period.

### A.  FANTASY SPORTS BEGIN AS AN INNOCENT COMPETITION BETWEEN FRIENDS AND FAMILY.

25.      Fantasy sports have existed since at least 1962 when—in a crowded New York hotel room—Raiders-minority-owner Bill Winkenbach developed a season-long "fantasy football" contest. His basic idea was simple: Contestants would join fantasy "leagues" where they would compete against one another. Before each football season, those leagues would hold "drafts," with contestants taking turns selecting real-life football players to "play" for their personal teams. During the season, contestants receive fantasy points based on the in-game accomplishments of the football players they selected. And at the end of the season, the contestant with the most fantasy points wins. Winkenbach's friends liked the idea, and so the Greater Oakland Professional Pigskin Prognosticators League (or "GOPPPL") was born.

26.      It took almost ten years for this idea to reach the public, when Andy Mousalimas— a founding father of GOPPL—launched the first *public* fantasy football league at his bar, King's X. The concept of fantasy sports spread by word of mouth from there. By the 1980s, over a million fans each year participated in fantasy leagues nationwide. And the concept soon spread beyond football. Leagues sprouted up for basketball, hockey, soccer, and countless other sports, games, and athletic competitions. Some leagues played for cash, with the lion's share of the entry fees going to the winner or winners. Others played for prizes, for bragging rights, or simply for the relief of not finishing in last place.

7

27.     With the rise of the internet, fantasy sports exploded in popularity. And what began as competitions among friends, family, and co-workers soon stretched to competitions of a global scale. In 1997, CBS became the first media company to host fantasy football leagues on its webpage. ESPN and other rival media companies followed suit. This arrangement proved mutually beneficial. Fans from around the world could compete against each other in digital leagues. And media companies profited from the increased foot traffic, with many creating content teams dedicated to discussing the "fantasy" aspect of sports.

### B.     DAILY FANTASY SPORTS EMERGE, RAISING PROP-BETTING CONCERNS.

28.     Eventually, fans grew impatient with having to wait an entire season to see results. So in the early 2000s, certain companies premiered a new product offering, known as Daily Fantasy Sports ("DFS"). In many respects, this initial DFS offering ("Traditional DFS") closely tracked the season-long fantasy sports offerings that came before: DFS companies would host real-time competitions between individuals. Competitors would score points in those competitions based on the real-life athletic performance of the athletes they select. At the end of the competition, the fan (or sometimes fans) with the most points wins.

29.     Unlike season-long fantasy sports, Traditional DFS competitions are short-lived— usually lasting just a day, a few days, or a week. They also employ a more commercial model. Usually, Traditional DFS providers charge an entry fee to compete in their contests. A portion of that fee goes towards paying the league winner (or winners). The rest goes to the Traditional DFS provider and is sometimes called a "rake."

30.     This Traditional DFS product stood on shaky legal ground. Participants stood to win or lose money based on the on-field performance of individual athletes. In that way,

8

Traditional DFS began to resemble a common fixture of sports betting: proposition bets, more commonly called "prop bets."

31.     In a prop bet, a gambler wagers on the occurrence (or non-occurrence) of a specific event during an athletic contest. For example, the gambler could wager that LeBron James will score over (or under) 25.5 points, that Saquon Barkeley will rush for over (or under) 85.5 net yards, or that Beau Brieske will have over (or under) 3.5 strikeouts. The rules are simple: If the gambler correctly guesses the result, he or she wins. Otherwise, the gambler loses the bet and the money he or she wagered.

32.     Sometimes, multiple such prop bets can be chained together into a single, larger bet called a "parlay." A parlay can contain as few as two distinct bets (sometimes called "legs") or as many as a dozen or more. At the end of the parlay, if the gambler has correctly predicted each leg of the parlay, he or she receives some multiple of his or her initial wager. The size of that multiplier is determined by how many legs the parlay had.

33.     Prop bets, with or without parlays, are quintessential sports gambling. They are prohibited in Kentucky.

34.     There is, however, a distinction between Traditional DFS offerings and prop bets: In Traditional DFS, participants compete—in real time—against other sports fans. They do not wager against lines set by professional gambling establishments. And because the contestants are (usually) all amateurs, an individual contestant knowledgeable about sports has at least *some* chance of having a statistical edge against other, less knowledgeable contestants. For example, a contestant who closely follows professional basketball could reasonably predict that Stephen Curry may score more points in an upcoming game than Ben Simmons. If matched up against less knowledgeable opponents, that contestant could seek to draft more talented players, improving his

9

or her odds of winning the league. That is an easier task than trying to predict whether Stephen Curry is likely to score over or under 24.5 points in an upcoming contest.

35.     Congress itself recognized this distinction. In 2006, it passed the Unlawful Internet Gambling Enforcement Act, Pub. L. No. 109–347, 120 Stat. 1952. That law added new criminal penalties for certain online wagering otherwise prohibited under state or federal law. But it excluded from its definition of gambling "participation in any fantasy or simulation sports game . . . in which," among other conditions, "[a]ll winning outcomes reflect the *relative knowledge and skill of the participants* and are determined predominantly by *accumulated statistical results of the performance of individuals* (athletes in the case of sports events) in multiple real-world sporting or other events)." 31 U.S.C. § 5362(1)(E)(ix) (emphases added). In other words, Congress created a bespoke exception in that statute narrowly tailored to cover Traditional DFS offerings.

36.     The Traditional DFS model remains popular among sports fans. Numerous such offerings are available nationwide, including in Kentucky.

### C.     PICK'EM OFFERINGS EMERGE, AND CROSS THE LINE INTO ILLEGAL SPORTS BETTING.

37.     Certain companies, however, saw a chance for still greater profit by transforming their business model to resemble that of a conventional sportsbook. To do this, they created a new offering, sometimes referred to as "Pick'em daily fantasy sports" ("Pick'em DFS"). While Pick'em DFS is sometimes labeled a subtype of daily fantasy sports, it lacks all the features that distinguish Traditional DFS from garden-variety sports betting. In Pick'em DFS, there is no real-time competition between players. Instead, gamblers place illegal, unregulated prop-bet parlays against the house. Pick'em DFS is flatly illegal under Kentucky law.

38.     The Pick'em DFS model is straightforward. Pick'em DFS companies offer individual gamblers a set of possible wagers, in the form of prop bets on individual athletes'

performances in upcoming competitions. Gamblers must then select two or more of those prop bets to form a parlay. So, using the previous examples, a gambler could create a three-legged parlay, wagering that on a specific day of athletic competitions (1) LeBron James will score over 25.5 points; and (2) Saquon Barkeley will rush for under 85.5 net yards; and (3) Beau Brieske will have over 3.5 strikeouts.

39.     Typically, gamblers must guess *each* leg correctly for their parlay to pay out (or "hit"). Using the above example, if a gambler got all three legs of his parlay correct, he or she could expect a payout of about 6x the amount of money he or she risked. But if he or she got even one leg wrong, he or she would lose the entire amount wagered.

40.     Sometimes, Pick'em DFS companies offer modified versions of the same basic arrangement. For example, they may allow a gambler to collect if he or she correctly guesses four out of five legs of a parlay. However, the payout multiplier would be reduced accordingly. Those variants do not alter the basic way Pick'em DFS companies function.

41.     To ensure they turn a profit, Pick'em DFS providers rig the math in their favor. They do so in at least two distinct ways.

42.     *First*, Pick'em DFS companies may sometimes offer gamblers wagers that are themselves tilted towards the house. For example, in some cases they may offer a customer the option to wager on LeBron James scoring (1) *over* 25.5 points; or (2) *under* 23.5 points. If the actual score is between those ranges, both sets of prop bets would fail.

43.     *Second*, Pick'em DFS companies set payout multipliers that are far too low for any gambler, on expectation, to break even. On information and belief, they employ statisticians and proprietary software to set betting lines that are no better than 50/50 value propositions. In setting those lines, they use data (not widely available to gamblers) about the volume and magnitude of

11

Presiding Judge: HON. PHILLIP J. SHEPHERD (648260)

bets placed on their platform and on other rival platforms. For example, if gamblers generally favor one side of a prop bet, Pick'em DFS companies can shift the betting line to induce more bets on the other side. As a result, gamblers cannot expect to pick correctly more than half the time.

44.     Pick'em DFS providers' payout structure does not keep pace with gamblers' low chance success on multi-legal parlays. On expectation, a gambler's odds of correctly guessing a two-player parlay would be 1 in 4. That same gambler's odds of correctly guessing a three-player parlay would be 1 in 8; a four-player parlay would be 1 in 16; and a five-player parlay would be 1 in 32. To break even in expected value, that gambler would therefore require payouts of *at least* 4x (for a two-player parlay), 8x (for a three-player parlay), 16x (for a four-player parlay), and 32x (for a five-player parlay). Adjusting for increased risk, the necessary payouts would need to be even higher for gamblers to break even in expected value.

45.     Pick'em companies' payouts fall well short of those marks. On information and belief, their payouts are usually at or around 3x, 6x, 10x, and 20x, respectively. This disparity ensures that, each time a gambler wagers on a Pick'em DFS offering, that gambler loses expected value. Given enough time, the Pick'em DFS provider will come out ahead.

46.     Indeed, Pick'em DFS provides an even *worse* value proposition than the traditional prop-bet parlays offered in sportsbooks. For example, one Pick'em DFS provider prominently advertised on social media a parlay in which a gambler risked $5,000 to win $50,000. However, in a traditional sports book, that same parlay would have paid out more than $100,000. In other words, the gambler placing that bet received *less than half* of the expected value that he or she would have gotten at a sportsbook.

12

### D.     PICK'EM OFFERINGS ARE ILLEGAL, UNREGULATED SPORTS GAMBLING.

47.     Pick'em DFS offerings violate Kentucky's regulations on sports betting.  The State requires that "[s]ports wagering licensees and service providers that accept wagers online via websites and mobile applications" satisfy various conditions, including registration.  *Id.* § 230.805(3).  Yet Pick'em DFS companies have failed to satisfy those requirements.  That sort of "[s]ports wagering shall not be offered" in Kentucky.  *Id.* § 230.805(2).  Nor can there be any doubt that their products qualify as sports wagering.  Kentucky defines a "sports wager" as a "a sum of money or representation of value that is risked on a sporting event for which the outcome is uncertain."  809 KAR 10:001(66).  That is precisely what gamblers stake when they use Pick'em DFS providers offerings.

48.     In all material respects, Pick'em DFS is indistinguishable from the prop-bet parlays bets regularly offered at sportsbooks, casinos, and other gambling establishments.  And unlike Traditional DFS, they cannot be fairly described as a game in which "[a]ll winning outcomes reflect the *relative knowledge and skill of the participants.*"  31 U.S.C. § 5362(1)(E)(ix) (emphasis added).  Rather, one participant (the gambler) bets the over/under against lines set by a professional, albeit illegal and unregulated, gambling establishment (the Pick'em DFS company).

49.     Pick'em DFS offerings are, by definition, games of luck and not games of skill.  Numerous unknowable and unpredictable factors—physical and mental variables, third parties' decision-making, and random chance—can affect a player's performance in any given competition.  And unlike Traditional DFS (where competitors can at least leverage their *comparative* knowledge of professional players against similarly situated individuals) Pick'em DFS requires gamblers to compete against over/under lines set by professional gambling

13

Presiding Judge: HON. PHILLIP J. SHEPHERD (648260)

establishments, and determined with the help of special expertise, technology, and data that regular gamblers cannot readily access.

50. Empirical analyses confirm that sports bettors struggle to establish an edge against professional oddsmakers. And while certain gamblers come to believe otherwise, studies have confirmed those beliefs are largely the result of cognitive distortions and do not reflect a genuine skill edge over the betting platform.

51. Even if individual gamblers can gain a slight statistical edge against the house—for example, by trading on non-public insider information—that edge is almost always insufficient to offset the reduced payouts Pick'em DFS companies offer. As a result, it is overwhelmingly a losing proposition. Industry insiders estimate that no more than 1-3% of sports gamblers profit over an extended time horizon. And studies suggest that even this small cohort of successful gamblers likely owes their results to survivorship bias—the brute statistical fact that even in games with terrible odds, *somebody* must win *eventually*.

52. Moreover, even if that small group of *individual* gamblers could profit from Pick'em DFS offerings, it would be impossible for Pick'em DFS gamblers to *collectively* beat the house. Among other issues, Pick'em DFS companies can always adjust their betting lines to adapt to changes in gamblers' betting behavior. Any arbitrage a savvy gambler could identify, a Pick'em DFS company could legislate away.

53. It is no secret that Pick'em DFS offerings are illegal, unregulated sports betting. As the President of the American Gaming Association put it, Pick'em DFS offerings are merely "unlicensed sports betting masquerading as daily fantasy products." And a long and rapidly growing list of States have caught on to the blatant illegality of Pick'em DFS offerings and have taken decisive actions against them. Ohio and Maryland have long forbidden Pick'em DFS

14

Presiding Judge: HON. PHILLIP J. SHEPHERD (648260)

offerings. Michigan, New York, Colorado, and Arizona have more recently moved against them. And Maine, Virgina, Mississippi, Arkansas, Virginia, West Virginia, Wyoming, Kansas, and Illinois have all either sent cease-and-desist letters or have issued opinion letters driving Pick'em DFS offerings out of their States. That list continues to grow. Just as Pick'em DFS offerings are illegal in each of those States, they are illegal in Kentucky too.

### E.   PICK'EM COMPANIES SOLICIT SPORTS BETS FROM RESIDENTS IN KENTUCKY.

54.     Pick'em DFS providers have operated in Kentucky in plain sight—flagrantly violating Kentucky's anti-sports-betting laws. Each of the companies listed below has offered a Pick'em DFS product to residents of Kentucky within the statute of limitations period. Those Pick'em DFS Defendants' offerings in Kentucky share all the core features described above.

a. **Underdog Fantasy.** Launched in 2020, Underdog Fantasy has over 2.4 million active users. It proudly advertises on its website that it operates "pick'ems" in Kentucky. A review of its rules confirms that it operates a standard Pick'em DFS product. As one leading DFS website puts it, "Underdog . . . offer[s] the ability to wager on player props in their Pick'em-based format." That article goes on to say (emphasis added): "*Much like a sportsbook*, Pick'em allows users to parlay player props offered by the site for big payouts." Perhaps recognizing this issue, Underdog Fantasy recently withdrew its Pick'em DFS offerings from Kentucky. Yet that choice does not erase its liability for offering that product within the statute of limitations period.

b. **Dabble.** Dabble is a more recent Pick'em DFS provider currently limited to NBA betting. It has over 1 million active users. Dabble offers a "Pick'Em" optionality, which it describes "new and exciting way to bet, that focuses on player stats, and

player stats only!" Gamblers need only "pick whether a player will achieve either 'More' or 'Less' than a specific projection – giving [them] a 50/50 chance." That "Pick'Em" mode remains available in Kentucky.

55.     In addition to the details provided above, Plaintiff has independently investigated the websites and apps of the Pick'em Defendants. That investigation confirmed that each of those Defendants offered Kentucky residents the ability to place illegal, unregulated sports bets through a Pick'em DFS offering within the statute of limitations.

56.     On information and belief, Kentucky residents have gambled using each of the Pick'em DFS offerings offered by Pick'em DFS Defendants. On information and belief, Kentucky residents have (within the statute of limitations period) lost over $5 at a single time (or over the course of 24 hours) on both of those Pick'em DFS offerings and have failed to sue the Pick'em DFS Defendants under Kentucky's Statute of Anne within the statutorily prescribed six months.

**F.    PICK'EM OFFERINGS HAVE INJURED KENTUCKY RESIDENTS.**

57.     Business is good for Daily Fantasy Sports. The market is expected to reach a total value of $14.29 billion in 2025, up from $13.27 billion the year prior. And it is expected to grow to some $27.92 billion within the next few years. But that money has to come from somewhere. And as with other gambling products, that "somewhere" is the gamblers themselves. As noted previously, only a tiny sliver of all players—about 1% to 3%—manage to turn a profit. And even that 1% to 3% of players suffers through losing sittings (often, *multiple* losing sittings) along the way. The stakes of those losing sessions can be sky-high. Per industry studies, 5% of players wager at least $3,600 annually, and some individuals gamble $2 million or more each year on those platforms. For many Americans, that is money they cannot afford to lose.

58.     Nor is the impact only monetary. Sports gambling addiction is rampant, fueling a crisis in public health. A recent study confirms that "DFS participants behave similarly with participants in other forms of gambling activities," and that "additional consumer protections may be needed to prevent further problem behavior such as chasing." Those "DFS players are characterized by high gambling frequency and problem severity and comorbid problems, notably suicidal ideation." And this harm is concentrated in those who opt for Pick'em DFS offerings, rather than the Traditional DFS ones describes above. Whereas Traditional DFS models played "between friends and family" can promote healthy social engagement, "[d]aily games . . . are more like gambling" and are instead linked to "higher levels of . . . online gambling" of various types."

59.     Young individuals suffer most acutely. Per one industry study, some 58% of 18- to 22-year-olds gamble on sports each year, with roughly 10% gambling on sports each week and 4% doing so daily. Sports gambling addictions can begin as early as age 10, and studies have found that between 4% and 8% suffer from problem gambling. In addition to being financially ruinous, that habit can take a severe emotional toll too. One study shows that, of problem gamblers who have sought out treatment, "between 22 and 81 percent . . . have been found to have suicidal ideations," and "between 7 and 30 percent of individuals have had suicide attempts." Pick'em DFS seek to capitalize on that worrisome trend. As the co-founder of one Pick'em DFS provider put it, the goal of the company's Pick'em DFS product is to "make sports betting cool for kids."

60.     Pick'em DFS Defendants are among the largest Pick'em DFS companies operating in the United States, and they have among the largest user bases. On information and belief, they collectively account for a sizable portion of the Pick'em-DFS-based sports betting injury suffered in Kentucky each year.

17

### III.    SWEEPSTAKES CASINOS VIOLATE KENTUCKY LAW.

61.    Another set of Defendants also operate illegal, unregulated gambling operations within Kentucky: "Sweepstakes Casinos." These digital platforms allow Kentucky residents to gamble on typical casino games (including slots, blackjack, and craps) using a digital token that can be purchased with, and freely exchanged into, U.S. Dollars—typically at a 1:1 exchange rate. Sweepstakes casinos violate Kentucky's prohibitions on video gambling. And they can cause Kentucky residents to sustain massive losses each year.

### A.    SWEEPSTAKES CASINOS ARE AN ATTEMPTED END-RUN AROUND KENTUCKY'S PROHIBITION ON ONLINE CASINOS.

62.    Nationwide, only seven U.S. states permit real-money online casino gaming. Kentucky is not one on that list. The State broadly criminalizes "knowingly advanc[ing] or profit[ing] from unlawful gambling activity," KRS § 528.030, and makes it a first-degree offense to "[r]eceiv[e] in connection with a lottery … [m]ore than $500 in any one day of money played in the scheme or enterprise," *id.* § 528.020. The State does not currently, and has never, licensed online casinos. Sweepstakes Casinos are no more than an attempted end-run around Kentucky's clear prohibition on online casino gambling.

63.    For all their apparent complication, the basic operation of Sweepstakes Casinos is straightforward. They operate using a "two-tiered" currency system. Upon signing up, new members receive a quantity of virtual tokens, typically called "Gold Coins." Gamblers then get additional Gold Coins periodically, for various reasons. For example, they may receive Gold Coins for logging on, completing certain objectives, or hitting membership milestones. Gamblers can use Gold Coins to play free versions of traditional casino games—for example, slots, blackjack, craps, and roulette. However, none of those games give prizes redeemable outside the website. Nor can gamblers convert their Gold Coins into cash, directly or indirectly.

18

64.     However, once gamblers have signed up, they can purchase a secondary currency: a virtual token usually called "Sweeps Coins." Like Gold Coins, Sweeps Coins can be used to play customary casino games. But unlike Gold Coins, games purchased with Sweeps Coins come with real stakes. Gamblers can win (and lose) Sweeps Coins. And gamblers can exchange their Sweeps Coins for real-life prizes or can cash them out for real U.S. dollars.

65.     In all relevant respects, Sweeps Coins are merely a placeholder token for real currency. In that way, they are identical to the gambling chips widely used in brick-and-mortar casinos across the country. Upon entering a physical casino, gamblers can exchange their real money for "chips." They can then use those chips to place wagers on a variety of games in the casino. When the gamblers leave, they can cash out their chips, reverting them back to regular currency. Sweeps Coins work in precisely the same way.

66.     To conceal their business model, Sweepstakes Casinos insist that they do not actually allow gamblers to purchase Sweeps Coins. Instead, they say, they offer a "sweepstake." And to keep up this ruse, they will usually only permit gamblers to purchase "bundles" which include *both* an (arbitrary) amount of Gold Coins and a (not-arbitrary) amount of Sweeps Coins. This sleight-of-hand, however, changes nothing.

67.     On information and belief, Gold Coins have zero (or close to zero) economic value. If gamblers only wish to play free casino games, they can do so with the supply of free Gold Coins they regularly receive. Should they run out, they can create a new (free) account on the same Sweepstakes Casinos or on a rival Sweepstakes Casino. And of course, they can play materially identical games (for free) on countless other online platforms, without any associated Gold Coin requirement. Given all those options, it defies credulity to believe gamblers would purchase bundles for the purpose of procuring Gold Coins.

68.    On information and belief, Sweepstakes Casinos know that gamblers purchase those bundles only for the Sweeps Coins. And various features of Sweepstakes Casinos' business operations confirm as much.

69.    *First*, gamblers can almost always purchase Sweeps Coins at exactly a 1:1 (or nearly 1:1) conversion rate. To induce larger purchasers, Sweepstakes Casinos sometimes offer slightly better deals in bulk—for example, $1,000 may get a gambler 1,050 Sweeps Coins, rather than 1,000. But this is just a disguised cash inducement for gamblers to invest in the platform. As a recent article points out, this "nearly 1:1 correlation between Sweeps Coins and dollars spent is so commonplace that one prominent sweepstakes affiliate admitted that it basically 'gives you the same amount of free sweeps coins for your payment (like paying $30 for 30 free sweeps).'"

70.    *Second*, gamblers can almost always cash out their Sweeps Coins for U.S. dollars at precisely a 1:1 conversion rate. In this way, they operate as a perfect stand-in for real currency. This is intentional. Sweepstakes Casinos could have set any conversion rate they pleased. But by opting for a rate at near 1:1, they make it easy for gamblers to understand precisely how much— in real dollars—is on the line when they gamble. On information and belief, this can enhance the experience for gamblers, who seek the thrill of winning real money.

71.    *Third*, as a recent article notes, this 1:1 conversion rate becomes especially striking "when juxtaposed against the astronomically high number of Gold Coins received relative to dollars spent," a rate which can "exceed 10:000:1 in many cases." In truth, the ratio of Gold Coins to dollars spent could just as easily be 1,000,000,000:1. As noted above, Gold Coins have no economic value. On information and belief, gamblers purchase packages containing both Gold Coins and Sweeps Coins because—and *only* because—they contain Sweeps Coins. And on

20

information and belief, those same gamblers seek Sweeps Coins because—and *only* because—they permit the gamblers to engage in real-cash online gambling, in violation of State law.

72.     *Fourth*, Sweepstakes Casinos' advertising and promotional materials show that they understand consumers value only Sweeps Coins.  For example, many of their websites take pains to emphasize not *all* their bundles contain Sweeps Coins.  But of course, the fact that Sweepstakes Casinos make it *possible* to purchase Gold Coins in isolation does not mean that real customers choose to do so on any meaningful scale.  The inclusion of this language is instead a cynical effort to throw regulators off their tails.

73.     Similarly, Sweepstakes Casinos will make a small number of Sweeps Coins available without purchase.  They usually gift a small starting amount of Sweeps Coins as a sign-up bonus—a move to induce new individuals to sign up.  They may also gift some Sweeps Coins when gamblers link their social media accounts to their website, making it easier for the Sweepstakes Casino to send them and their friends targeted ads.  And Sweepstakes Casinos sometimes offer a small amount of Sweeps Coins to gamblers who complete pointless, convoluted, or little-advertised tasks—for example, filling out a mail-in form noted only in the website's fine print.  But through these tasks, according to one recent article, users ordinarily "can receive [only] a limited number of Sweeps Coins (usually no more than 5)."  "[B]y far the most common way to obtain Sweeps Coins beyond a nominal amount is by purchasing Gold Coins."  And these gifts are in fact no gifts at all.  Sweepstakes Casinos know that, given enough time, they will eventually win this money back (and, if the gambler sticks around on their platform, they will win much more).

## B.     SWEEPSTAKES CASINOS OPERATE IN KENTUCKY.

74.     Sweepstakes Casinos operate openly within Kentucky ("Sweepstakes Defendants").  The most prominent of these is the collection of companies associated with the

21

Blazesoft product. Blazesoft operates Zula Casino, which boasts of offering a "wide array of popular casino-style games." Zula Casino is a self-described Sweepstakes Casino that uses the customary two-tier currency system, with "Gold Goins" and "Sweeps Coins." Zula Casino operates in Kentucky.

75.     Plaintiff has independently investigated the websites and apps of the Sweepstakes Defendants listed in this Complaint. That investigation confirmed that each of those Defendants have (within the statute of limitations period) offered Kentucky residents the ability to place illegal, unregulated sports bets through a Sweepstakes Casino offering.

76.     On information and belief, Kentucky residents have gambled using the Sweepstakes Casino offerings controlled by Sweepstakes Defendants. On information and belief, Kentucky residents have (within the statute of limitations period) lost over $5 at a single time (or over the course of 24 hours) on their offerings and have failed to sue the Sweepstakes Defendants under Kentucky's Statute of Anne within the statutorily prescribed six months.

## C.     SWEEPSTAKES CASINOS ARE ILLEGAL GAMBLING.

77.     Sweepstakes Defendants unequivocally operate illegal gambling operations in Kentucky. As noted above, online casinos are prohibited under various provisions of Kentucky law. And in all relevant respects, Sweepstakes Casinos are indistinguishable from online casinos that this State has long forbidden.

78.     To start, there is no doubt that the games they offer—slots, blackjack, craps, and others—are games of chance. Indeed, Sweepstakes Defendants take pride in mimicking the offerings that gamblers could find at a casino. Some of their advertising seeks to emphasize that overlap. Nor is there any doubt that the games involving Sweeps Coins are played for prizes. Not only can Sweeps Coins be redeemed for real-life prizes, but they can also be cashed in for U.S. dollars. That, too, is quintessential gambling.

22

79.      Sweepstakes Defendants thus stake their continued operation *entirely* on the theory that there is no legal "consideration"—that is, that gamblers do not wager anything of value provided by them in exchange for the chance to win. But that requires this Court accepting the incredible suggestion that gamblers do not really purchase Sweeps Coins, *only* Gold Coins. For the reasons outlined above, that strains belief, defies basic logic, runs contrary to the expressed positions of both gamblers and industry experts, and is inconsistent with the revealed preferences of the very gamblers Sweepstakes Defendants take money from.

80.      Nor are others falling for Sweepstakes Defendants' inartful ruse. Across the Country, a growing number of state Attorneys General and state regulators—including those in Arizona, Connecticut, Delaware, Maryland, Michigan, and Pennsylvania—have moved against Sweepstakes Casinos (including Sweepstakes Defendants) in the form of criminal investigations and cease-and-desist letters. Other States are currently contemplating action of their own. Sweepstakes Defendants (and other companies like Sweepstakes Defendants) have collectively been hit with over a dozen class actions by private parties. And as a recent article summarizes, across the Country, "every relevant judicial decision . . . which addresses a 'casino-style' sweepstakes game that awards users entries to play real money games of chance in an amount commensurate with dollars spent was found to be illegal gambling," regardless of whether "free entries were also available without a product purchase."

81.      This Court should join this nationwide consensus by finding the obvious: Sweepstakes Defendants' offerings *look* like online casinos because they *are* online casinos. And online casinos are not permitted under Kentucky law. Because Sweepstakes Defendants' offerings are illegal, unregulated gambling operations within the State, Plaintiff can sue to recover the total

23

amount of unclaimed losses suffered by Kentucky residents on Sweepstakes Defendants' platforms within the statute of limitations period.

### D.     SWEEPSTAKES CASINOS INJURE KENTUCKY RESIDENTS.

82.     Sweepstakes Casinos have grown tenfold over the last five years. As of 2025 they bring in over $8 billion annually. But as with other gambling operations, that money comes from one main source: gamblers. And the individual losses at Sweepstakes Casinos can be enormous. A recent criminal investigation in Connecticut against Defendant High 5 Casino revealed that a group of just 911 Connecticut gamblers alone lost, collectively, $937,938. Because Kentucky has a larger population than Connecticut, there is good reason to believe Kentucky residents have suffered at least a comparable (if not greater) total loss. And over the course of countless individual sittings, their total losses undoubtedly eclipse that figure.

83.     Sweepstakes Casinos are also dangerously addictive—above and beyond even other gambling offerings. They remove many of the barriers that guard against compulsive in-person gambling: for instance, the need to physically travel to a casino, and the need to exchange more money for chips. And the bombardment of visual and auditory stimulation on online casinos—combined with the high pace of the games—creates a uniquely dopamine-rich environment that has been shown to enhance addictive potential.

84.     Moreover, the fact that Sweepstakes Casinos masquerade as non-gambling products presents other risks. They lure in individuals ill-equipped for their business model. They also bait in individuals already suffering from gambling addictions, circumventing critical public health safeguards. For example, of the subgroup of the 911 Connecticut gamblers discussed above, 108 had previously registered for that State's Voluntary Self-Exclusion List. Many Kentucky residents are similarly endeavoring to stop online gambling. Sweepstakes Casinos are yet one more obstacle standing in the way of that goal.

24

Presiding Judge: HON. PHILLIP J. SHEPHERD (648260)

85.     Sweepstakes Defendants are among the largest Sweepstakes Casinos operating in the United States and have among the largest user bases. On information and belief, they collectively account for a sizable portion of the Sweepstakes-Casino-based gambling injury suffered in Kentucky each year.

## COUNT I
### (Claim under KRS § 372.040)

86.     Plaintiff brings this count against all Defendants under the Statute of Anne, KRS § 372.040.

87.     Upon information and belief, thousands of individuals within Kentucky have lost— and continue to lose—more than $5 at any single time (or over 24 hours) by gambling with Defendants, and have not sued to recover those losses within six months of payment to Defendants. The identity and precise number of such gamblers ("Gambling Victims") is within the unique possession of Defendants.

88.     Defendants are gambling "winner[s]" within the meaning of KRS § 372.040.

89.     Plaintiff qualifies as a "person" authorized to sue for the recovery losses at gaming within the meaning of KRS § 372.040. Plaintiff has not colluded with any Gambling Victims in bringing this action.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment against Defendant and respectfully requests that the Court grant the following relief:

A. Declaring that the Defendants are liable under the Statute of Anne, KRS § 372.040;

25

B. Awarding eligible damages, continuing until the time of final judgment, based on three times the value of the money, goods, chattels, or other things lost to Defendants at gambling;

C. Awarding the costs of prosecuting this action, including reasonable attorney's fees, experts' fees, and litigation costs together with interest;

D. Awarding pre- and post-judgment interest as allowed by law; and

E. Granting such other relief as the Court deems proper.

26

Presiding Judge: HON. PHILLIP J. SHEPHERD (648260)

Dated: June 11, 2025

Respectfully submitted,

*/s/ Grace E. L. Greenwell*

Grace E. L. Greenwell
graceg@bccnlaw.com
BAHE COOK CANTLEY & NEFZGER PLC
1041 Goss Avenue
Louisville, Kentucky 40217
(502) 587-2002 – Telephone
(502) 587-2006 – Facsimile

*/s/ Derek T. Ho*

Derek T. Ho (*pro hac, pending*)
Kyle B. Grigel (*pro hac, pending*)
KELLOGG, HANSEN, TODD, FIGEL &
    FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel: (202) 326-7900
Fax: (202) 326-7999
dho@kellogghansen.com
kgrigel@kellogghansen.com

*Counsel for Plaintiff*



Envelope

**Recycle me.**



ORIGIN ID:SDFA   (502) 469-5293
GRACE GREENWELL
1048 GOSS AVE
LOUISVILLE, KY 40217
UNITED STATES US

SHIP DATE: 30OCT25
ACTWGT: 1.15 LB
CAD: 6570813/ROSA2670

TO   DABBLE SPORTS LLC
     421 WEST MAIN ST

     FRANKFORT KY 40601
     (000) 000-0000              REF#
     REF#                        REF#



FedEx
Express

E

TRK#
1020 1   8856 2902 1667

FRI – 31 OCT 12:00P
PRIORITY OVERNIGHT

69 SMEA                          40601
                              KY-US   SDF



40601-1435 21
421 W MAIN ST   FRANKFORT KY
PRIORITY OVERNIGHT
112-4012

NOT ORIGINAL

DOCUMENT

AM

11/20/2025 09:19:35

92023

COMMONWEALTH OF KENTUCKY
FRANKLIN CIRCUIT COURT
DIVISION 1 (ONE)
CIVIL ACTION NO. 25-CI-00513
*(Electronically Filed)*

KENTUCKY GAMBLING RECOVERY
LLC                                                          PLAINTIFF

v.          **JOINT STIPULATION REGARDING EXTENSION
OF TIME TO FILE ANSWER OR OTHERWISE
RESPOND TO PLAINTIFF'S COMPLAINT**

UNDERDOG SPORTS HOLDINGS, INC.                    DEFENDANTS
dba UNDERDOG FANTASY;
DABBLE SPORTS, LLC;
DABBLE SPORTS PTY LTD;
BLAZESOFT LTD;
BLAZEGAMES, INC.;
SCPS LLC
dba ZULA CASINO

***** ***** *****

Plaintiff, Kentucky Gambling Recovery LLC, by and through counsel, and the above-named Defendants, by and through counsel, hereby stipulate and agree:

The above-named Defendants, without waiving any defenses other than to service and the form thereof, hereby acknowledge due and legal service of the Summons, the Complaint, and the First Amended Complaint filed in the Commonwealth of Kentucky Franklin Circuit Court. Defendants hereby waive formal service and all additional service and insurance of process, and any objections thereto, pursuant to the Kentucky Rules of Civil Procedure.

By agreement of the parties, Defendants deadline to file a responsive pleading is hereby extended up to, and including, January 30, 2026.

AGREED to this 19th day of November 2025.

NOT ORIGINAL

DOCUMENT

11/20/2025 09:19:35

AM

92023

*Grace E.L. Greenwell (w/ permission)*
Grace E.L. Greenwell
BAHE COOK CANTLEY & NEFZGER PLC
1041 Goss Avenue
Louisville, Kentucky 40217
Telephone: (502) 587-2002
Fax: (502) 587-2006
Email: graceg@bccnlaw.com

Derek T. Ho (Pro hac, Pending)
Kyle B. Grigel (Pro hac Pending)
KELLOGG, HANSEN, TODD, FIGEL &
FREDERICK, P.L.L.C.
1615 M. Street, N.W., Suite 400
Washington, D.C. 2003
Telephone: (202) 326-7900
Fax: (202) 326-7999
Email: dho@kelloghansen.com
        kgrigel@kelloghansen.com


COUNSEL FOR PLAINTIFF

*/s/ Timothy J. Weatherholt*
Timothy J. Weatherholt
FISHER & PHILLIPS LLP
220 West Main Street, Suite 1700
Louisville, Kentucky 40202
Telephone: (502) 565-3982
Fax: (502) 561-3991
Email: csiegenthaler@fisherphillips.com

COUNSEL FOR DEFENDANTS
UNDERDOG SPORTS HOLDINGS, INC.
d/b/a/ UNDERDOG FANTASY,
DABBLE SPORTS, LLC, and DABBLE
SPORTS PTY LTD;


*/s/ Richard M. Guarnieri (w/ permission)*
Richard M. Guarnieri
TRUE GUARNIER AYER, LLP
124 Clinton St.
Frankfort, KY 40601
Telephone: (502) 934-3763
Fax: (502) 605-9901
Email: rguar@truelawky.com

COUNSEL FOR DEFENDANTS BLAZESOFT
LTD, BLAZEGAMES, INC. and SCPS LLC
d/b/a/ ZULA

STP : 000002 of 000002

2

NOT ORIGINAL

DOCUMENT

11/26/2025 09:55:16

AM

92023

COMMONWEALTH OF KENTUCKY
FRANKLIN CIRCUIT COURT
DIVISION 1
CIVIL ACTION NO. 25-CI-00513

KENTUCKY GAMBLING RECOVERY LLC                           PLAINTIFF

**FIRST AMENDED COMPLAINT**

v.

UNDERDOG SPORTS HOLDINGS, INC.
dba UNDERDOG FANTASY;
DABBLE SPORTS, LLC;
DABBLE SPORTS PTY LTD;
BLAZESOFT LTD;
BLAZEGAMES, INC.;
SCPS LLC
dba ZULA CASINO

DEFENDANTS

\*          \*          \*          \*          \*

Plaintiff Kentucky Gambling Recovery LLC brings this action against Underdog Sports

Holdings, Inc., dba Underdog Fantasy; Dabble Sports LLC; Dabble Sports Pty LTD; Blazesoft,

Ltd.; Blazegames, Inc.; and SCPS LLC, dba Zula Casino (collectively, "Defendants") for recovery

of gambling losses under the Statute of Anne, KRS § 372.040.  Plaintiff alleges as follows:

### INTRODUCTION

1.          Kentucky ("the Commonwealth") comprehensively regulates gambling-related

activities within its borders.  To protect its residents from predatory and financially destructive

gambling enterprises, it has prescribed exacting civil and criminal penalties on all those who would

seek to sidestep that regulatory regime.  For most, the threat of those penalties is deterrence

enough.  But not for all.  Lured by the tremendous wealth of the Kentucky market, two groups of

companies have offered illegal, unregulated gambling products to Kentucky residents.

AMC : 000001 of 000027

NOT ORIGINAL
DOCUMENT
11/26/2025 09:55:16
AM          92023

2.      The first group has, within the statute of limitations period, offered a gambling product called "Pick'ems."  Hiding behind the moniker of "fantasy sports," Pick'ems allow individuals to bet against the house on the future performance of professional athletes. Specifically, they allow gamblers to place what sports books and casinos refer to as "prop bet parlays." Pick'ems are sports betting by any other name.  They are prohibited in Kentucky.

3.      The second group operates a gambling product called "Sweepstakes Casinos." These platforms allow Kentucky residents to play traditional casino games—such as slots, blackjack, craps, and more—for real money.  They do so behind the thinnest of legal veneers. Utilizing a two-tiered currency system, they permit users to play free games using worthless tokens, often called "Gold Coins."  They then allow those same users to purchase a second currency, usually called "Sweeps Coins," with real U.S. dollars.  Games played using Sweeps Coins can pay out in additional Sweeps Coins.  And Sweeps Coins can be cashed out, into U.S. dollars—usually at a precisely 1:1 exchange rate.

4.      Both Pick'ems and Sweepstakes Casinos have come under legal fire.  State Attorneys General and regulators have criminally investigated and have issued cease-and-desist letters to those businesses on the grounds that they offer illegal, unregulated gambling products. Private parties have filed lawsuits in state and federal court, making essentially the same allegations.  And the early returns from those efforts paint a grim picture for the future of unregulated Pick'ems and Sweepstakes Casinos in the United States.

5.      The Commonwealth of Kentucky has not yet entered the fray.  But it does not need to.  Like many States, Kentucky offers an additional safeguard against illegal, unregulated gambling: the Statute of Anne.  Based on a 1710 British law passed during the reign of Queen Anne, that law makes certain gambling debts unenforceable.  It allows a losing party to sue the

AMC : 000002 of 000027

2

winning party for the value of losses exceeding $5 at one time (or over the course of 24 hours). And should the losing party fail to sue within six months, it authorizes anyone to bring a claim against the winning party for three times the amount of damages (and costs).

6.      Defendants have operated in Kentucky without regard to the Commonwealth's legal limits for years.  Each year, they take tens of millions of dollars from Kentucky gamblers. But under the Statute of Anne, each time Defendants caused a gambler in Kentucky to suffer gambling losses of at least $5 at one time (or over the course of 24 hours), that person had the right to sue under the Statute of Anne within six months to recover for his or her losses, plus costs. And after those six months, *any* person may sue for three times the amount of each gambler's unrecovered losses, receiving half as a relator's fee, and sharing the other half with the County in which the gambling injury occurred.  In filing this action, Plaintiff does just that.

## PARTIES

7.      Plaintiff Kentucky Gambling Recovery LLC is a company formed under the laws of Delaware to enforce Kentucky's gambling laws.  Its mailing address is 1700 S MacDill Ave, Suite 300, Tampa, FL 33629.  Plaintiff has no relationship to any gambler who has suffered gambling losses and has not colluded with any gamblers in bringing this action.

8.      On information and belief, Defendant Underdog Sports Holdings, Inc., dba Underdog Fantasy ("Underdog") is a Delaware corporation based in New York.  It has operated an unlawful, unregulated sports betting website and mobile app accessible within Kentucky and regularly used by Kentucky residents.

9.      On information and belief, Defendant Dabble Sports, LLC ("Dabble) is a Delaware corporation based in Austin, Texas.  It has operated an unlawful, unregulated sports betting website and mobile app accessible within Kentucky and regularly used by Kentucky residents.

AMC : 000003 of 000027

3

NOT ORIGINAL

DOCUMENT

11/26/2025 09:55:16

AM

92023

10. On information and belief, Dabble Sports Pty LTD Is an Australian corporation based in Darwin, Australia. It is the parent company of Dabble Sports, LLC, and through it operates an unlawful, unregulated sports betting website and mobile app accessible within Kentucky and regularly used by Kentucky residents.

11. On information and belief, Defendant Blazesoft Ltd. ("Blazesoft") is a Canadian corporation based in Ontario, Canada. It operates unlawful, unregulated online casinos that are accessible within Kentucky and that are regularly used by Kentucky residents.

12. On information and belief, Defendant Blazegames, Inc. ("Blazegames") is a Delaware corporation based in Ontario, Canada. Blazegames is owned and operated by Blazesoft and operates SCPS LLC, dba Zula Casino. Through those subsidiaries, it operates unlawful, unregulated online casinos that are accessible within Kentucky and that are regularly used by Kentucky residents.

13. On information and belief, SCPS LLC, dba Zula Casino ("Zula"), is a Delaware corporation based in Delaware. Zula is owned and operated by Blazesoft. Zula operates unlawful, unregulated online casinos that are accessible within Kentucky and that are regularly used by Kentucky residents.

14. On information and belief, Defendants are each "winner[s]" at gaming within the meaning of the Statute of Anne, KRS. § 372.040. On information and belief, each regularly causes Kentucky residents to suffer gambling losses in excess of $5 at one time (or over the course of 24 hours).

### JURISDICTION AND VENUE

15. This case arises under KRS § 372.040.

16. This Court has jurisdiction over the subject matter of this case pursuant to Ky. Const. § 112(5) , and KRS § 23A.010.

4

AMC : 000004 of 000027

NOT ORIGINAL
DOCUMENT

11/26/2025 09:55:16
AM

92023

17.      This Court has personal jurisdiction over the Defendants under KRS § 454.210. Each of the Defendants transacts substantial business in the Commonwealth, has purposefully directed its activities at residents of the Commonwealth, and has purposefully availed itself of the benefits of the Commonwealth's laws.

18.      Plaintiff is a Delaware resident and its claims against Defendants arise out of, relate to, and have a substantial connection with business purposefully transacted by Defendants in Kentucky.

19.      Venue is proper in Kentucky because, among other things, the conduct underlying Plaintiff's claims occurred in Kentucky.

## STATEMENT OF THE FACTS

**I.      KENTUCKY'S STATUTE OF ANNE ALLOWS PRIVATE PARTIES TO SUE FOR ILLEGAL GAMBLING.**

20.      While the specific conduct animating this lawsuit is recent, the cause of action animating it is not.  It traces its roots to the twilight of the House of Stuart, when Queen Anne adopted what would become known as the Statute of Anne of 1710.  That law had two main elements.  The first declared a wide range of gambling transactions void (in effect, freeing the losing party from any obligation to pay the winner).  The second created causes of action to claw back gambling gains.  Those who lost at least "the Sum or Value of ten Pounds" could sue the winner to recover the amount they lost, along "with Co[s]ts of Suit."  And should the losing party fail to initiate that recovery suit within three months without just cause, any other person could bring a suit against the winning party for treble damages, with half going to the person suing "the other Moiety to the u[s]e of the Poor of the Pari[s]h."  Resembling the modern *qui tam* action, this last provision deputized the public to serve as private Attorneys General.  It also offered a financial incentive to induce them to investigate and pursue claims against gamblers.

AMC : 000005 of 000027

5

NOT ORIGINAL
DOCUMENT
11/26/2025 09:55:16
AM
92023

21.     Kentucky's own statute operates in much the same way.  It provides that "[i]f any person loses to another at one (1) time, or within twenty-four (24) hours, five dollars ($5) or more," the loser "may recover it . . . by action brought within five (5) years after the payment, transfer or delivery."  KRS § 372.020.  And "[i]f the loser or his creditor does not, within six (6) months after its payment or delivery to the winner, sue for the money or thing lost, and prosecute the suit to recovery with due diligence, any other person may sue the winner, and recover treble the value of the money or thing lost, if suit is brought within five (5) years from the delivery or payment."  *Id.* § 372.040.

22.     Gambling is closely regulated in Kentucky.  The Commonwealth offers sports betting—but only via regulated and licensed vendors.  *See id.* §§ 230.805, 230.808.  All other "[s]ports wagering shall not be offered."  *Id.* § 230.805(2).  Kentucky requires that "[s]ports wagering licensees and service providers that accept wagers online via websites and mobile applications" satisfy various conditions.  *Id.* § 230.805(3).  No Defendant in this case is licensed under that regime.  The Commonwealth broadly prohibits other sorts of gambling, making it a crime to "knowingly advance[] or profits from unlawful gambling activity."  KRS § 528.030.  And it is an aggravated crime to "[r]eceiv[e] in connection with a lottery … [m]ore than $500 in any one day of money played in the scheme or enterprise."  *Id.* § 528.020.  The Commonwealth does not permit, and has never permitted, online casinos.

23.     Defendants in this case have provided gambling offerings that fly in the face of those regulations.  In filing this action, Plaintiff sues to recover the ill-gotten gains obtained by Defendants from their unlawful offerings:  Pick'ems and Sweepstakes Casinos.

## II.     PICK'EMS VIOLATE KENTUCKY LAW.

24.     Unregulated sports betting is illegal in Kentucky.  But certain Defendants have disregarded that prohibition, offering within the Commonwealth a product typically called

AMC : 000006 of 000027

6

NOT ORIGINAL
DOCUMENT
11/26/2025 09:55:16
AM
92023

"Pick'ems." Pick'ems purport to be a variant of fantasy sports. But in truth, they are no more than a rebranding of otherwise illegal, unregulated prop-bet parlays (against the house) on the future performance of individual professional athletes. Pick'ems are not authorized under Kentucky law. Accordingly, Plaintiff may sue for the uncollected losses Pick'em daily fantasy sports ("Pick'em DFS") Defendants have inflicted on the people of Kentucky within the statute of limitations period.

### A.    FANTASY SPORTS BEGIN AS AN INNOCENT COMPETITION BETWEEN FRIENDS AND FAMILY.

25.      Fantasy sports have existed since at least 1962 when—in a crowded New York hotel room—Raiders-minority-owner Bill Winkenbach developed a season-long "fantasy football" contest. His basic idea was simple: Contestants would join fantasy "leagues" where they would compete against one another. Before each football season, those leagues would hold "drafts," with contestants taking turns selecting real-life football players to "play" for their personal teams. During the season, contestants receive fantasy points based on the in-game accomplishments of the football players they selected. And at the end of the season, the contestant with the most fantasy points wins. Winkenbach's friends liked the idea, and so the Greater Oakland Professional Pigskin Prognosticators League (or "GOPPPL") was born.

26.      It took almost ten years for this idea to reach the public, when Andy Mousalimas—a founding father of GOPPL—launched the first *public* fantasy football league at his bar, King's X. The concept of fantasy sports spread by word of mouth from there. By the 1980s, over a million fans each year participated in fantasy leagues nationwide. And the concept soon spread beyond football. Leagues sprouted up for basketball, hockey, soccer, and countless other sports, games, and athletic competitions. Some leagues played for cash, with the lion's share of the entry fees going to the winner or winners. Others played for prizes, for bragging rights, or simply for the relief of not finishing in last place.

7

AMC : 000007 of 000027

NOT ORIGINAL
DOCUMENT
11/26/2025 09:55:16
AM
92023

27.    With the rise of the internet, fantasy sports exploded in popularity.  And what began as competitions among friends, family, and co-workers soon stretched to competitions of a global scale.  In 1997, CBS became the first media company to host fantasy football leagues on its webpage.  ESPN and other rival media companies followed suit.  This arrangement proved mutually beneficial.  Fans from around the world could compete against each other in digital leagues.  And media companies profited from the increased foot traffic, with many creating content teams dedicated to discussing the "fantasy" aspect of sports.

### B.    DAILY FANTASY SPORTS EMERGE, RAISING PROP-BETTING CONCERNS.

28.    Eventually, fans grew impatient with having to wait an entire season to see results. So in the early 2000s, certain companies premiered a new product offering, known as Daily Fantasy Sports ("DFS").  In many respects, this initial DFS offering ("Traditional DFS") closely tracked the season-long fantasy sports offerings that came before:  DFS companies would host real-time competitions between individuals.  Competitors would score points in those competitions based on the real-life athletic performance of the athletes they select.  At the end of the competition, the fan (or sometimes fans) with the most points wins.

29.    Unlike season-long fantasy sports, Traditional DFS competitions are short-lived— usually lasting just a day, a few days, or a week.  They also employ a more commercial model. Usually, Traditional DFS providers charge an entry fee to compete in their contests.  A portion of that fee goes towards paying the league winner (or winners).  The rest goes to the Traditional DFS provider and is sometimes called a "rake."

30.    This Traditional DFS product stood on shaky legal ground.  Participants stood to win or lose money based on the on-field performance of individual athletes.  In that way,

NOT ORIGINAL
DOCUMENT
AM
11/26/2025 09:55:16
92023

Traditional DFS began to resemble a common fixture of sports betting: proposition bets, more commonly called "prop bets."

31. In a prop bet, a gambler wagers on the occurrence (or non-occurrence) of a specific event during an athletic contest. For example, the gambler could wager that LeBron James will score over (or under) 25.5 points, that Saquon Barkeley will rush for over (or under) 85.5 net yards, or that Beau Brieske will have over (or under) 3.5 strikeouts. The rules are simple: If the gambler correctly guesses the result, he or she wins. Otherwise, the gambler loses the bet and the money he or she wagered.

32. Sometimes, multiple such prop bets can be chained together into a single, larger bet called a "parlay." A parlay can contain as few as two distinct bets (sometimes called "legs") or as many as a dozen or more. At the end of the parlay, if the gambler has correctly predicted each leg of the parlay, he or she receives some multiple of his or her initial wager. The size of that multiplier is determined by how many legs the parlay had.

33. Prop bets, with or without parlays, are quintessential sports gambling. They are prohibited in Kentucky.

34. There is, however, a distinction between Traditional DFS offerings and prop bets: In Traditional DFS, participants compete—in real time—against other sports fans. They do not wager against lines set by professional gambling establishments. And because the contestants are (usually) all amateurs, an individual contestant knowledgeable about sports has at least *some* chance of having a statistical edge against other, less knowledgeable contestants. For example, a contestant who closely follows professional basketball could reasonably predict that Stephen Curry may score more points in an upcoming game than Ben Simmons. If matched up against less knowledgeable opponents, that contestant could seek to draft more talented players, improving his

AMC : 000009 of 000027

NOT ORIGINAL
DOCUMENT
AM
11/26/2025 09:55:16
92023

or her odds of winning the league.  That is an easier task than trying to predict whether Stephen Curry is likely to score over or under 24.5 points in an upcoming contest.

35.     Congress itself recognized this distinction.  In 2006, it passed the Unlawful Internet Gambling Enforcement Act, Pub. L. No. 109–347, 120 Stat. 1952.  That law added new criminal penalties for certain online wagering otherwise prohibited under state or federal law.  But it excluded from its definition of gambling "participation in any fantasy or simulation sports game . . . in which," among other conditions, "[a]ll winning outcomes reflect the *relative knowledge and skill of the participants* and are determined predominantly by *accumulated statistical results of the performance of individuals* (athletes in the case of sports events) in multiple real-world sporting or other events)."  31 U.S.C. § 5362(1)(E)(ix) (emphases added).  In other words, Congress created a bespoke exception in that statute narrowly tailored to cover Traditional DFS offerings.

36.     The Traditional DFS model remains popular among sports fans.  Numerous such offerings are available nationwide, including in Kentucky.

### C.     PICK'EM OFFERINGS EMERGE, AND CROSS THE LINE INTO ILLEGAL SPORTS BETTING.

37.     Certain companies, however, saw a chance for still greater profit by transforming their business model to resemble that of a conventional sportsbook.  To do this, they created a new offering, sometimes referred to as "Pick'em daily fantasy sports" ("Pick'em DFS").  While Pick'em DFS is sometimes labeled a subtype of daily fantasy sports, it lacks all the features that distinguish Traditional DFS from garden-variety sports betting.  In Pick'em DFS, there is no real-time competition between players.  Instead, gamblers place illegal, unregulated prop-bet parlays against the house.  Pick'em DFS is flatly illegal under Kentucky law.

38.     The Pick'em DFS model is straightforward.  Pick'em DFS companies offer individual gamblers a set of possible wagers, in the form of prop bets on individual athletes'

AM C : 000010 of 000027

performances in upcoming competitions.  Gamblers must then select two or more of those prop bets to form a parlay.  So, using the previous examples, a gambler could create a three-legged parlay, wagering that on a specific day of athletic competitions (1) LeBron James will score over 25.5 points; and (2) Saquon Barkeley will rush for under 85.5 net yards; and (3) Beau Brieske will have over 3.5 strikeouts.

39.     Typically, gamblers must guess *each* leg correctly for their parlay to pay out (or "hit").  Using the above example, if a gambler got all three legs of his parlay correct, he or she could expect a payout of about 6x the amount of money he or she risked.  But if he or she got even one leg wrong, he or she would lose the entire amount wagered.

40.     Sometimes, Pick'em DFS companies offer modified versions of the same basic arrangement.  For example, they may allow a gambler to collect if he or she correctly guesses four out of five legs of a parlay.  However, the payout multiplier would be reduced accordingly.  Those variants do not alter the basic way Pick'em DFS companies function.

41.     To ensure they turn a profit, Pick'em DFS providers rig the math in their favor.  They do so in at least two distinct ways.

42.     *First*, Pick'em DFS companies may sometimes offer gamblers wagers that are themselves tilted towards the house.  For example, in some cases they may offer a customer the option to wager on LeBron James scoring (1) *over* 25.5 points; or (2) *under* 23.5 points. If the actual score is between those ranges, both sets of prop bets would fail.

43.     *Second*, Pick'em DFS companies set payout multipliers that are far too low for any gambler, on expectation, to break even.  On information and belief, they employ statisticians and proprietary software to set betting lines that are no better than 50/50 value propositions.  In setting those lines, they use data (not widely available to gamblers) about the volume and magnitude of

AMC : 000011 of 000027

NOT ORIGINAL
DOCUMENT
11/26/2025 09:55:16
AM
92023

bets placed on their platform and on other rival platforms.  For example, if gamblers generally favor one side of a prop bet, Pick'em DFS companies can shift the betting line to induce more bets on the other side.  As a result, gamblers cannot expect to pick correctly more than half the time.

44.      Pick'em DFS providers' payout structure does not keep pace with gamblers' low chance success on multi-legal parlays.  On expectation, a gambler's odds of correctly guessing a two-player parlay would be 1 in 4.  That same gambler's odds of correctly guessing a three-player parlay would be 1 in 8; a four-player parlay would be 1 in 16; and a five-player parlay would be 1 in 32.  To break even in expected value, that gambler would therefore require payouts of *at least* 4x (for a two-player parlay), 8x (for a three-player parlay), 16x (for a four-player parlay), and 32x (for a five-player parlay).  Adjusting for increased risk, the necessary payouts would need to be even higher for gamblers to break even in expected value.

45.      Pick'em companies' payouts fall well short of those marks.  On information and belief, their payouts are usually at or around 3x, 6x, 10x, and 20x, respectively.  This disparity ensures that, each time a gambler wagers on a Pick'em DFS offering, that gambler loses expected value.  Given enough time, the Pick'em DFS provider will come out ahead.

46.      Indeed, Pick'em DFS provides an even *worse* value proposition than the traditional prop-bet parlays offered in sportsbooks.  For example, one Pick'em DFS provider prominently advertised on social media a parlay in which a gambler risked $5,000 to win $50,000.  However, in a traditional sports book, that same parlay would have paid out more than $100,000.  In other words, the gambler placing that bet received *less than half* of the expected value that he or she would have gotten at a sportsbook.

NOT ORIGINAL
DOCUMENT

11/26/2025 09:55:16
AM

92023

### D.     PICK'EM OFFERINGS ARE ILLEGAL, UNREGULATED SPORTS GAMBLING.

47.     Pick'em DFS offerings violate Kentucky's regulations on sports betting.  The Commonwealth requires that "[s]ports wagering licensees and service providers that accept wagers online via websites and mobile applications" satisfy various conditions, including registration.  *Id.* § 230.805(3).  Yet Pick'em DFS companies have failed to satisfy those requirements.  That sort of "[s]ports wagering shall not be offered" in Kentucky.  *Id.* § 230.805(2).  Nor can there be any doubt that their products qualify as sports wagering.  Kentucky defines a "sports wager" as a "a sum of money or representation of value that is risked on a sporting event for which the outcome is uncertain."  809 KAR 10:001(66).  That is precisely what gamblers stake when they use Pick'em DFS providers offerings.

48.     In all material respects, Pick'em DFS is indistinguishable from the prop-bet parlays bets regularly offered at sportsbooks, casinos, and other gambling establishments.  And unlike Traditional DFS, they cannot be fairly described as a game in which "[a]ll winning outcomes reflect the *relative knowledge and skill of the participants*."  31 U.S.C. § 5362(1)(E)(ix) (emphasis added).  Rather, one participant (the gambler) bets the over/under against lines set by a professional, albeit illegal and unregulated, gambling establishment (the Pick'em DFS company).

49.     Pick'em DFS offerings are, by definition, games of luck and not games of skill.  Numerous unknowable and unpredictable factors—physical and mental variables, third parties' decision-making, and random chance—can affect a player's performance in any given competition.  And unlike Traditional DFS (where competitors can at least leverage their *comparative* knowledge of professional players against similarly situated individuals) Pick'em DFS requires gamblers to compete against over/under lines set by professional gambling

AMC : 000013 of 000027

NOT ORIGINAL
DOCUMENT
11/26/2025 09:55:16
AM                                                                                                              92023

establishments, and determined with the help of special expertise, technology, and data that regular gamblers cannot readily access.

50.     Empirical analyses confirm that sports bettors struggle to establish an edge against professional oddsmakers.  And while certain gamblers come to believe otherwise, studies have confirmed those beliefs are largely the result of cognitive distortions and do not reflect a genuine skill edge over the betting platform.

51.     Even if individual gamblers can gain a slight statistical edge against the house—for example, by trading on non-public insider information—that edge is almost always insufficient to offset the reduced payouts Pick'em DFS companies offer.  As a result, it is overwhelmingly a losing proposition.  Industry insiders estimate that no more than 1-3% of sports gamblers profit over an extended time horizon.  And studies suggest that even this small cohort of successful gamblers likely owes their results to survivorship bias—the brute statistical fact that even in games with terrible odds, *somebody* must win *eventually*.

52.     Moreover, even if that small group of *individual* gamblers could profit from Pick'em DFS offerings, it would be impossible for Pick'em DFS gamblers to *collectively* beat the house.  Among other issues, Pick'em DFS companies can always adjust their betting lines to adapt to changes in gamblers' betting behavior.  Any arbitrage a savvy gambler could identify, a Pick'em DFS company could legislate away.

53.     It is no secret that Pick'em DFS offerings are illegal, unregulated sports betting.  As the President of the American Gaming Association put it, Pick'em DFS offerings are merely "unlicensed sports betting masquerading as daily fantasy products."  And a long and rapidly growing list of states have caught on to the blatant illegality of Pick'em DFS offerings and have taken decisive actions against them.  Ohio and Maryland have long forbidden Pick'em DFS

AMC : 000014 of 000027

14

NOT ORIGINAL
DOCUMENT
11/26/2025 09:55:16
AM
92023

offerings.  Michigan, New York, Colorado, and Arizona have more recently moved against them.
And Maine, Virgina, Mississippi, Arkansas, Virginia, West Virginia, Wyoming, Kansas, and
Illinois have all either sent cease-and-desist letters or have issued opinion letters driving Pick'em
DFS offerings out of their states.  That list continues to grow.  Just as Pick'em DFS offerings are
illegal in each of those states, they are illegal in Kentucky too.

### E.     PICK'EM COMPANIES SOLICIT SPORTS BETS FROM RESIDENTS IN KENTUCKY.

54.     Pick'em DFS providers have operated in Kentucky in plain sight—flagrantly
violating Kentucky's anti-sports-betting laws.  Each of the companies listed below has offered a
Pick'em DFS product to residents of Kentucky within the statute of limitations period.  Those
Pick'em DFS Defendants' offerings in Kentucky share all the core features described above.

    a.  **Underdog Fantasy.**  Launched in 2020, Underdog Fantasy has over 2.4 million
active users.  It proudly advertises on its website that it operates "pick'ems" in
Kentucky.  A review of its rules confirms that it operates a standard Pick'em DFS
product.  As one leading DFS website puts it, "Underdog . . . offer[s] the ability to
wager on player props in their Pick'em-based format."  That article goes on to say
(emphasis added):  "*Much like a sportsbook*, Pick'em  allows users to parlay player
props offered by the site for big payouts."  Perhaps recognizing this issue, Underdog
Fantasy recently withdrew its Pick'em DFS offerings from Kentucky.  Yet that
choice does not erase its liability for offering that product within the statute of
limitations period.

    b.  **Dabble.**  Dabble is a more recent Pick'em DFS provider currently limited to NBA
betting.  It has over 1 million active users.  Dabble offers a "Pick'Em" optionality,
which it describes "new and exciting way to bet, that focuses on player stats, and

AMC : 000015 of 000027

15

NOT ORIGINAL
DOCUMENT
11/26/2025 09:55:16
AM                                                          92023

player stats only!"  Gamblers need only "pick whether a player will achieve either 'More' or 'Less' than a specific projection – giving [them] a 50/50 chance."  That "Pick'Em" mode remains available in Kentucky.

55.     In addition to the details provided above, Plaintiff has independently investigated the websites and apps of the Pick'em Defendants.  That investigation confirmed that each of those Defendants offered Kentucky residents the ability to place illegal, unregulated sports bets through a Pick'em DFS offering within the statute of limitations.

56.     On information and belief, Kentucky residents have gambled using each of the Pick'em DFS offerings offered by Pick'em DFS Defendants.  On information and belief, Kentucky residents have (within the statute of limitations period) lost over $5 at a single time (or over the course of 24 hours) on both of those Pick'em DFS offerings and have failed to sue the Pick'em DFS Defendants under Kentucky's Statute of Anne within the statutorily prescribed six months.

## F.    PICK'EM OFFERINGS HAVE INJURED KENTUCKY RESIDENTS.

57.     Business is good for Daily Fantasy Sports.  The market is expected to reach a total value of $14.29 billion in 2025, up from $13.27 billion the year prior.  And it is expected to grow to some $27.92 billion within the next few years.  But that money has to come from somewhere.  And as with other gambling products, that "somewhere" is the gamblers themselves.  As noted previously, only a tiny sliver of all players—about 1% to 3%—manage to turn a profit.  And even that 1% to 3% of players suffers through losing sittings (often, *multiple* losing sittings) along the way.  The stakes of those losing sessions can be sky-high.  Per industry studies, 5% of players wager at least $3,600 annually, and some individuals gamble $2 million or more each year on those platforms.  For many Americans, that is money they cannot afford to lose.

AMC : 000016 of 000027

NOT ORIGINAL
DOCUMENT
AM
11/26/2025 09:55:16
92023

58.     Nor is the impact only monetary.  Sports gambling addiction is rampant, fueling a crisis in public health.  A recent study confirms that "DFS participants behave similarly with participants in other forms of gambling activities," and that "additional consumer protections may be needed to prevent further problem behavior such as chasing."  Those "DFS players are characterized by high gambling frequency and problem severity and comorbid problems, notably suicidal ideation."  And this harm is concentrated in those who opt for Pick'em DFS offerings, rather than the Traditional DFS ones describes above.  Whereas Traditional DFS models played "between friends and family" can promote healthy social engagement, "[d]aily games . . . are more like gambling" and are instead linked to "higher levels of . . . online gambling" of various types."

59.     Young individuals suffer most acutely. Per one industry study, some 58% of 18- to 22-year-olds gamble on sports each year, with roughly 10% gambling on sports each week and 4% doing so daily. Sports gambling addictions can begin as early as age 10, and studies have found that between 4% and 8% suffer from problem gambling.  In addition to being financially ruinous, that  habit can take a severe emotional toll too.  One study shows that, of problem gamblers who have sought out treatment, "between 22 and 81 percent . . . have been found to have suicidal ideations," and "between 7 and 30 percent of individuals have had suicide attempts."  Pick'em DFS seek to capitalize on that worrisome trend.  As the co-founder of one Pick'em DFS provider put it, the goal of the company's Pick'em DFS product is to "make sports betting cool for kids."

60.     Pick'em DFS Defendants are among the largest Pick'em DFS companies operating in the United States, and they have among the largest user bases.  On information and belief, they collectively account for a sizable portion of the Pick'em-DFS-based sports betting injury suffered in Kentucky each year.

AMC : 000017 of 000027

NOT ORIGINAL
DOCUMENT
11/26/2025 09:55:16
AM
92023.

### III.     SWEEPSTAKES CASINOS VIOLATE KENTUCKY LAW.

61.     Another set of Defendants also operate illegal, unregulated gambling operations within Kentucky: "Sweepstakes Casinos."  These digital platforms allow Kentucky residents to gamble on typical casino games (including slots, blackjack, and craps) using a digital token that can be purchased with, and freely exchanged into, U.S. Dollars—typically at a 1:1 exchange rate. Sweepstakes casinos violate Kentucky's prohibitions on video gambling.  And they can cause Kentucky residents to sustain massive losses each year.

#### A.     SWEEPSTAKES CASINOS ARE AN ATTEMPTED END-RUN AROUND KENTUCKY'S PROHIBITION ON ONLINE CASINOS.

62.     Nationwide, only seven U.S. states permit real-money online casino gaming. Kentucky is not one on that list.   The Commonwealth broadly criminalizes "knowingly advanc[ing] or profit[ing] from unlawful gambling activity," KRS § 528.030, and makes it a first-degree offense to "[r]eceiv[e] in connection with a lottery … [m]ore than $500 in any one day of money played in the scheme or enterprise," *id.* § 528.020.  The Commonwealth does not currently, and has never, licensed online casinos.  Sweepstakes Casinos are no more than an attempted end-run around Kentucky's clear prohibition on online casino gambling.

63.     For all their apparent complication, the basic operation of Sweepstakes Casinos is straightforward.  They operate using a "two-tiered" currency system.  Upon signing up, new members receive a quantity of virtual tokens, typically called "Gold Coins."  Gamblers then get additional Gold Coins periodically, for various reasons.  For example, they may receive Gold Coins for logging on, completing certain objectives, or hitting membership milestones.  Gamblers can use Gold Coins to play free versions of traditional casino games—for example, slots, blackjack, craps, and roulette.  However, none of those games give prizes redeemable outside the website.  Nor can gamblers convert their Gold Coins into cash, directly or indirectly.

AMC : 000018 of 000027

NOT ORIGINAL
DOCUMENT
11/26/2025 09:55:16
AM
92023

64.     However, once gamblers have signed up, they can purchase a secondary currency: a virtual token usually called "Sweeps Coins."  Like Gold Coins, Sweeps Coins can be used to play customary casino games.  But unlike Gold Coins, games purchased with Sweeps Coins come with real stakes.  Gamblers can win (and lose) Sweeps Coins.  And gamblers can exchange their Sweeps Coins for real-life prizes or can cash them out for real U.S. dollars.

65.     In all relevant respects, Sweeps Coins are merely a placeholder token for real currency.  In that way, they are identical to the gambling chips widely used in brick-and-mortar casinos across the country. Upon entering a physical casino, gamblers can exchange their real money for "chips." They can then use those chips to place wagers on a variety of games in the casino. When the gamblers leave, they can cash out their chips, reverting them back to regular currency.  Sweeps Coins work in precisely the same way.

66.     To conceal their business model, Sweepstakes Casinos insist that they do not actually allow gamblers to purchase Sweeps Coins.  Instead, they say, they offer a "sweepstake." And to keep up this ruse, they will usually only permit gamblers to purchase "bundles" which include *both* an (arbitrary) amount of Gold Coins and a (not-arbitrary) amount of Sweeps Coins. This sleight-of-hand, however, changes nothing.

67.     On information and belief, Gold Coins have zero (or close to zero) economic value. If gamblers only wish to play free casino games, they can do so with the supply of free Gold Coins they regularly receive.  Should they run out, they can create a new (free) account on the same Sweepstakes Casinos or on a rival Sweepstakes Casino.  And of course, they can play materially identical games (for free) on countless other online platforms, without any associated Gold Coin requirement.  Given all those options, it defies credulity to believe gamblers would purchase bundles for the purpose of procuring Gold Coins.

AMC : 000019 of 000027

NOT ORIGINAL
DOCUMENT
11/26/2025 09:55:16
AM

92023

68.     On information and belief, Sweepstakes Casinos know that gamblers purchase those bundles only for the Sweeps Coins.  And various features of Sweepstakes Casinos' business operations confirm as much.

69.     *First*, gamblers can almost always purchase Sweeps Coins at exactly a 1:1 (or nearly 1:1) conversion rate.  To induce larger purchasers, Sweepstakes Casinos sometimes offer slightly better deals in bulk—for example, $1,000 may get a gambler 1,050 Sweeps Coins, rather than 1,000.  But this is just a disguised cash inducement for gamblers to invest in the platform.  As a recent article points out, this "nearly 1:1 correlation between Sweeps Coins and dollars spent is so commonplace that one prominent sweepstakes affiliate admitted that it basically 'gives you the same amount of free sweeps coins for your payment (like paying $30 for 30 free sweeps).'"

70.     *Second*, gamblers can almost always cash out their Sweeps Coins for U.S. dollars at precisely a 1:1 conversion rate.  In this way, they operate as a perfect stand-in for real currency.  This is intentional.  Sweepstakes Casinos could have set any conversion rate they pleased.  But by opting for a rate at near 1:1, they make it easy for gamblers to understand precisely how much—in real dollars—is on the line when they gamble.  On information and belief, this can enhance the experience for gamblers, who seek the thrill of winning real money.

71.     *Third*, as a recent article notes, this 1:1 conversion rate becomes especially striking "when juxtaposed against the astronomically high number of Gold Coins received relative to dollars spent," a rate which can "exceed 10:000:1 in many cases."  In truth, the ratio of Gold Coins to dollars spent could just as easily be 1,000,000,000:1.  As noted above, Gold Coins have no economic value.  On information and belief, gamblers purchase packages containing both Gold Coins and Sweeps Coins because—and *only* because—they contain Sweeps Coins. And on

AMC : 000020 of 000027

NOT ORIGINAL
DOCUMENT
11/26/2025 09:55:16
AM
92023

information and belief, those same gamblers seek Sweeps Coins because—and *only* because—they permit the gamblers to engage in real-cash online gambling, in violation of state law.

72.     *Fourth*, Sweepstakes Casinos' advertising and promotional materials show that they understand consumers value only Sweeps Coins. For example, many of their websites take pains to emphasize not *all* their bundles contain Sweeps Coins. But of course, the fact that Sweepstakes Casinos make it *possible* to purchase Gold Coins in isolation does not mean that real customers choose to do so on any meaningful scale. The inclusion of this language is instead a cynical effort to throw regulators off their tails.

73.     Similarly, Sweepstakes Casinos will make a small number of Sweeps Coins available without purchase. They usually gift a small starting amount of Sweeps Coins as a sign-up bonus—a move to induce new individuals to sign up. They may also gift some Sweeps Coins when gamblers link their social media accounts to their website, making it easier for the Sweepstakes Casino to send them and their friends targeted ads. And Sweepstakes Casinos sometimes offer a small amount of Sweeps Coins to gamblers who complete pointless, convoluted, or little-advertised tasks—for example, filling out a mail-in form noted only in the website's fine print. But through these tasks, according to one recent article, users ordinarily "can receive [only] a limited number of Sweeps Coins (usually no more than 5)." "[B]y far the most common way to obtain Sweeps Coins beyond a nominal amount is by purchasing Gold Coins." And these gifts are in fact no gifts at all. Sweepstakes Casinos know that, given enough time, they will eventually win this money back (and, if the gambler sticks around on their platform, they will win much more).

## B.     SWEEPSTAKES CASINOS OPERATE IN KENTUCKY.

74.     Sweepstakes Casinos operate openly within Kentucky ("Sweepstakes Defendants"). The most prominent of these is the collection of companies associated with the

21

AMC : 000021 of 000027

NOT ORIGINAL
DOCUMENT
11/26/2025 09:55:16
AM
92023

Blazesoft product. Blazesoft operates Zula Casino, which boasts of offering a "wide array of popular casino-style games." Zula Casino is a self-described Sweepstakes Casino that uses the customary two-tier currency system, with "Gold Goins" and "Sweeps Coins." Zula Casino operates in Kentucky.

75.     Plaintiff has independently investigated the websites and apps of the Sweepstakes Defendants listed in this Complaint. That investigation confirmed that each of those Defendants have (within the statute of limitations period) offered Kentucky residents the ability to place illegal, unregulated sports bets through a Sweepstakes Casino offering.

76.     On information and belief, Kentucky residents have gambled using the Sweepstakes Casino offerings controlled by Sweepstakes Defendants. On information and belief, Kentucky residents have (within the statute of limitations period) lost over $5 at a single time (or over the course of 24 hours) on their offerings and have failed to sue the Sweepstakes Defendants under Kentucky's Statute of Anne within the statutorily prescribed six months.

## C.     SWEEPSTAKES CASINOS ARE ILLEGAL GAMBLING.

77.     Sweepstakes Defendants unequivocally operate illegal gambling operations in Kentucky. As noted above, online casinos are prohibited under various provisions of Kentucky law. And in all relevant respects, Sweepstakes Casinos are indistinguishable from online casinos that this Commonwealth has long forbidden.

78.     To start, there is no doubt that the games they offer—slots, blackjack, craps, and others—are games of chance. Indeed, Sweepstakes Defendants take pride in mimicking the offerings that gamblers could find at a casino. Some of their advertising seeks to emphasize that overlap. Nor is there any doubt that the games involving Sweeps Coins are played for prizes. Not only can Sweeps Coins be redeemed for real-life prizes, but they can also be cashed in for U.S. dollars. That, too, is quintessential gambling.

AMC : 000022 of 000027

`

22

NOT ORIGINAL
DOCUMENT
11/26/2025 09:55:16
AM
92023

79.     Sweepstakes Defendants thus stake their continued operation *entirely* on the theory that there is no legal "consideration"—that is, that gamblers do not wager anything of value provided by them in exchange for the chance to win.  But that requires this Court accepting the incredible suggestion that gamblers do not really purchase Sweeps Coins, *only* Gold Coins.  For the reasons outlined above, that strains belief, defies basic logic, runs contrary to the expressed positions of both gamblers and industry experts, and is inconsistent with the revealed preferences of the very gamblers Sweepstakes Defendants take money from.

80.     Nor are others falling for Sweepstakes Defendants' inartful ruse.  Across the Country, a growing number of state Attorneys General and state regulators—including those in Arizona, Connecticut, Delaware, Maryland, Michigan, and Pennsylvania—have moved against Sweepstakes Casinos (including Sweepstakes Defendants) in the form of criminal investigations and cease-and-desist letters.  Other states are currently contemplating action of their own. Sweepstakes Defendants (and other companies like Sweepstakes Defendants) have collectively been hit with over a dozen class actions by private parties.  And as a recent article summarizes, across the Country, "every relevant judicial decision . . . which addresses a 'casino-style' sweepstakes game that awards users entries to play real money games of chance in an amount commensurate with dollars spent was found to be illegal gambling," regardless of whether "free entries were also available without a product purchase."

81.     This Court should join this nationwide consensus by finding the obvious: Sweepstakes Defendants' offerings *look* like online casinos because they *are* online casinos.  And online casinos are not permitted under Kentucky law.  Because Sweepstakes Defendants' offerings are illegal, unregulated gambling operations within the Commonwealth, Plaintiff can sue to

AMC : 000023 of 000027

23

NOT ORIGINAL
DOCUMENT
11/26/2025 09:55:16
AM
92023

recover the total amount of unclaimed losses suffered by Kentucky residents on Sweepstakes Defendants' platforms within the statute of limitations period.

### D.     SWEEPSTAKES CASINOS INJURE KENTUCKY RESIDENTS.

82.     Sweepstakes Casinos have grown tenfold over the last five years.  As of 2025 they bring in over $8 billion annually.  But as with other gambling operations, that money comes from one main source: gamblers.  And the individual losses at Sweepstakes Casinos can be enormous. A recent criminal investigation in Connecticut against Defendant High 5 Casino revealed that a group of just 911 Connecticut gamblers alone lost, collectively, $937,938.  Because Kentucky has a larger population than Connecticut, there is good reason to believe Kentucky residents have suffered at least a comparable (if not greater) total loss.  And over the course of countless individual sittings, their total losses undoubtedly eclipse that figure.

83.     Sweepstakes Casinos are also dangerously addictive—above and beyond even other gambling offerings.  They remove many of the barriers that guard against compulsive in-person gambling: for instance, the need to physically travel to a casino, and the need to exchange more money for chips.  And the bombardment of visual and auditory stimulation on online casinos—combined with the high pace of the games—creates a uniquely dopamine-rich environment that has been shown to enhance addictive potential.

84.     Moreover, the fact that Sweepstakes Casinos masquerade as non-gambling products presents other risks.  They lure in individuals ill-equipped for their business model.  They also bait in individuals already suffering from gambling addictions, circumventing critical public health safeguards.  For example, of the subgroup of the 911 Connecticut gamblers discussed above, 108 had previously registered for that state's Voluntary Self-Exclusion List.  Many Kentucky residents are similarly endeavoring to stop online gambling.  Sweepstakes Casinos are yet one more obstacle standing in the way of that goal.

AMC : 000024 of 000027

NOT ORIGINAL
DOCUMENT
11/26/2025 09:55:16
AM                                                                              92023

85.      Sweepstakes Defendants are among the largest Sweepstakes Casinos operating in the United States and have among the largest user bases.  On information and belief, they collectively account for a sizable portion of the Sweepstakes-Casino-based gambling injury suffered in Kentucky each year.

## COUNT I
### (Claim under KRS § 372.040)

86.      Plaintiff brings this count against all Defendants under the Statute of Anne, KRS § 372.040.

87.      Upon information and belief, thousands of individuals within Kentucky have lost—and continue to lose—more than $5 at any single time (or over 24 hours) by gambling with Defendants, and have not sued to recover those losses within six months of payment to Defendants. The identity and precise number of such gamblers ("Gambling Victims") is within the unique possession of Defendants.

88.      Defendants are gambling "winner[s]" within the meaning of KRS § 372.040.

89.      Plaintiff qualifies as a "person" authorized to sue for the recovery losses at gaming within the meaning of KRS § 372.040.  Plaintiff has not colluded with any Gambling Victims in bringing this action.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment against Defendant and respectfully requests that the Court grant the following relief:

A.  Declaring that the Defendants are liable under the Statute of Anne, KRS § 372.040;

25

AMC : 000025 of 000027

NOT ORIGINAL
DOCUMENT
AM
11/26/2025 09:55:16
92023

B.  Awarding eligible damages, continuing until the time of final judgment, based on three times the value of the money, goods, chattels, or other things lost to Defendants at gambling;

C.  Awarding the costs of prosecuting this action, including reasonable attorney's fees, experts' fees, and litigation costs together with interest;

D.  Awarding pre- and post-judgment interest as allowed by law; and

E.  Granting such other relief as the Court deems proper.

AMC : 000026 of 000027

NOT ORIGINAL
DOCUMENT
11/26/2025 09:55:16
AM
92023

Dated:  October 28, 2025

Respectfully submitted,

/s/ Grace E. L. Greenwell

Grace E. L. Greenwell
graceg@bccnlaw.com
BAHE COOK CANTLEY & NEFZGER PLC
1041 Goss Avenue
Louisville, Kentucky 40217
(502) 587-2002 – Telephone
(502) 587-2006 – Facsimile


Derek T. Ho (*pro hac, pending*)
Kyle B. Grigel (*pro hac, pending*)
KELLOGG, HANSEN, TODD, FIGEL &
    FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel: (202) 326-7900
Fax: (202) 326-7999
dho@kellogghansen.com
kgrigel@kellogghansen.com


*Counsel for Plaintiff*

AMC : 000027 of 000027

DOCUMENT

AM

| AOC-E-105 Sum Code: CI Rev. 9-14 |  | Case #: **25-CI-00513** ~~ORIGINAL~~ |
|---|---|---|
| Commonwealth of Kentucky Court of Justice *Courts.ky.gov* | | Court: **CIRCUIT** |
| CR 4.02; Cr Official Form 1 | **CIVIL SUMMONS** | County: **FRANKLIN** 11/26/2025 11:42:54 |

*Plantiff,* **KENTUCKY GAMBLING RECOVERY LLC VS. UNDERDOG SPORTS HOLDINGS,,** *Defendant*

TO: **DABBLE SPORTS, LLC**

The Commonwealth of Kentucky to Defendant:

You are hereby notified that a **legal action has been filed against you** in this Court demanding relief as shown on the document delivered to you with this Summons. **Unless a written defense is made by you or by an attorney on your behalf within twenty (20) days** following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached complaint.

The name(s) and address(es) of the party or parties demanding relief against you or his/her (their) attorney(s) are shown on the document delivered to you with this Summons.

*Kathryn Marshall*

Franklin Circuit Clerk
Date: **6/11/2025**

Presiding Judge: HON. PHILLIP J. SHEPHERD (648260)

## Proof of Service

This Summons was:

☐ Served by delivering a true copy and the Complaint (or other initiating document)

To: _____

☐ Not Served because: _____

Date: _____, 20_____

_____
Served By

_____
Title

CI : 000001 of 000001



eFiled



Commonwealth of Kentucky
Court of Justice   *Courts.ky.gov*

CR 4.02; Cr Official Form 1

Case #:  **25-CI-00513** ~~ORIGINAL~~
Court:  **CIRCUIT**
County:  **FRANKLIN**

11/26/2025 11:43:09

92023

# CIVIL SUMMONS

*Plaintiff,* **KENTUCKY GAMBLING RECOVERY LLC VS. UNDERDOG SPORTS HOLDINGS,,** *Defendant*

### TO: **DABBLE SPORTS PAY LTD**

The Commonwealth of Kentucky to Defendant:

You are hereby notified that a **legal action has been filed against you** in this Court demanding relief as shown on the document delivered to you with this Summons. **Unless a written defense is made by you or by an attorney on your behalf within twenty (20) days** following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached complaint.

The name(s) and address(es) of the party or parties demanding relief against you or his/her (their) attorney(s) are shown on the document delivered to you with this Summons.

*Kathryn Marshall*

Franklin Circuit Clerk
Date: **6/11/2025**

Presiding Judge: HON. PHILLIP J. SHEPHERD (648260)

---

## Proof of Service

This Summons was:

☐ Served by delivering a true copy and the Complaint (or other initiating document)

    To: _____

☐ Not Served because: _____

Date: _____, 20 _____

                 _____
                            Served By

                 _____
                             Title

CI : 000001 of 000001



Page 1 of 1



DOCUMENT

AM

AOC-E-105    Sum Code: CI
Rev. 9-14

Commonwealth of Kentucky
Court of Justice    *Courts.ky.gov*

CR 4.02; Cr Official Form 1



# CIVIL SUMMONS

ORIGINAL

11/26/2025 11:43:20

92023

Case #: **25-CI-00513**
Court:    **CIRCUIT**
County:  **FRANKLIN**

---

*Plantiff,* **KENTUCKY GAMBLING RECOVERY LLC VS. UNDERDOG SPORTS HOLDINGS,**, *Defendant*

TO:  **BLAZESOFT LTD**

The Commonwealth of Kentucky to Defendant:

You are hereby notified that a **legal action has been filed against you** in this Court demanding relief as shown on the document delivered to you with this Summons. **Unless a written defense is made by you or by an attorney on your behalf within twenty (20) days** following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached complaint.

The name(s) and address(es) of the party or parties demanding relief against you or his/her (their) attorney(s) are shown on the document delivered to you with this Summons.

*Kathryn Marshall*

Franklin Circuit Clerk
Date: **6/11/2025**

<div style="writing-mode: vertical">Presiding Judge: HON. PHILLIP J. SHEPHERD (648260)</div>

---

## Proof of Service

This Summons was:

☐ Served by delivering a true copy and the Complaint (or other initiating document)

　　To: _____

☐ Not Served because: _____

　Date: _____, 20_____

_____
Served By

_____
Title

<div style="writing-mode: vertical">CI : 000001 of 000001</div>

---

Summons ID: @90005826450
CIRCUIT: 25-CI-00513 Return to Filer for Service
KENTUCKY GAMBLING RECOVERY LLC VS. UNDERDOG SPORTS HOLDINGS,



Page 1 of 1



Commonwealth of Kentucky
Court of Justice    *Courts.ky.gov*

CR 4.02; Cr Official Form 1



Case #: **25-CI-00513** ~~NOT ORIGINAL~~

Court: **CIRCUIT**

County: **FRANKLIN**   11/26/2025 11:43:33

**CIVIL SUMMONS**

92023

DOCUMENT

AM

---

*Plantiff,* **KENTUCKY GAMBLING RECOVERY LLC VS. UNDERDOG SPORTS HOLDINGS,,** *Defendant*

TO: **BLAZEGAMES, INC.**

The Commonwealth of Kentucky to Defendant:

You are hereby notified that a **legal action has been filed against you** in this Court demanding relief as shown on the document delivered to you with this Summons. **Unless a written defense is made by you or by an attorney on your behalf within twenty (20) days** following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached complaint.

The name(s) and address(es) of the party or parties demanding relief against you or his/her (their) attorney(s) are shown on the document delivered to you with this Summons.

*Kathryn Marshall*

Franklin Circuit Clerk
Date: **6/11/2025**

<div style="text-align:right">Presiding Judge: HON. PHILLIP J. SHEPHERD (648260)</div>

## Proof of Service

This Summons was:

☐ Served by delivering a true copy and the Complaint (or other initiating document)

    To: _____

☐ Not Served because: _____

Date: _____, 20 _____

_____
Served By

_____
Title

<div style="text-align:right">CI : 000001 of 000001</div>



**eFiled**

AOC-E-105    Sum Code: CI
Rev. 9-14
Commonwealth of Kentucky
Court of Justice    *Courts.ky.gov*
CR 4.02; Cr Official Form 1



Case #: **25-CI-00513**
Court: **CIRCUIT**
County: **FRANKLIN**

NOT ORIGINAL
11/26/2025 11:42:40

92023

# CIVIL SUMMONS

*Plantiff,* **KENTUCKY GAMBLING RECOVERY LLC VS. UNDERDOG SPORTS HOLDINGS,,** *Defendant*

TO:   **UNDERDOG SPORTS HOLDINGS, INC. DBA UNDE**

The Commonwealth of Kentucky to Defendant:

You are hereby notified that a **legal action has been filed against you** in this Court demanding relief as shown on the document delivered to you with this Summons. **Unless a written defense is made by you or by an attorney on your behalf within twenty (20) days** following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached complaint.

The name(s) and address(es) of the party or parties demanding relief against you or his/her (their) attorney(s) are shown on the document delivered to you with this Summons.

*Kathryn Marshall*

Franklin Circuit Clerk
Date: **6/11/2025**

---

## Proof of Service

This Summons was:

☐ Served by delivering a true copy and the Complaint (or other initiating document)

To: _____

☐ Not Served because: _____

Date: _____, 20_____

_____
Served By

_____
Title

Presiding Judge: HON. PHILLIP J. SHEPHERD (648260)

CI : 000001 of 000001

Summons ID: @90005826447
CIRCUIT: 25-CI-00513 Return to Filer for Service
KENTUCKY GAMBLING RECOVERY LLC VS. UNDERDOG SPORTS HOLDINGS,



Page 1 of 1

eFiled

AOC-E-105     Sum Code: CI
Rev. 9-14
Commonwealth of Kentucky
Court of Justice     Courts.ky.gov
CR 4.02; Cr Official Form 1

Case #: **25-CI-00513** ORIGINAL
Court: **CIRCUIT**
County: **FRANKLIN**



DOCUMENT
AM

**CIVIL SUMMONS**

11/26/2025 11:43:44

92023

---

*Plantiff,* **KENTUCKY GAMBLING RECOVERY LLC VS. UNDERDOG SPORTS HOLDINGS,**, *Defendant*

TO: **SCPS LLC DBA ZULA CASINO**

The Commonwealth of Kentucky to Defendant:

You are hereby notified that a **legal action has been filed against you** in this Court demanding relief as shown on the document delivered to you with this Summons. **Unless a written defense is made by you or by an attorney on your behalf within twenty (20) days** following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached complaint.

The name(s) and address(es) of the party or parties demanding relief against you or his/her (their) attorney(s) are shown on the document delivered to you with this Summons.

*Kathryn Marshall*

Franklin Circuit Clerk
Date: **6/11/2025**

Presiding Judge: HON. PHILLIP J. SHEPHERD (648260)

---

## Proof of Service

This Summons was:

☐ Served by delivering a true copy and the Complaint (or other initiating document)

    To: _____

☐ Not Served because: _____

Date: _____, 20 _____

_____
Served By

_____
Title

CI : 000001 of 000001



Page 1 of 1




| **Case Memo** | **25-CI-00513** |
|---|---|

*TORT OTHER;;;;;*

| **Parties** | **25-CI-00513** |
|---|---|

**BLAZEGAMES, INC.** as **DEFENDANT / RESPONDENT**

**Summons**

**CIVIL SUMMONS** issued on **10/29/2025** by way of **RETURNED TO ATTORNEY/PETITIONER**
**CIVIL SUMMONS** issued on **06/11/2025** by way of **RETURNED TO ATTORNEY/PETITIONER**

**BLAZESOFT LTD** as **DEFENDANT / RESPONDENT**

**Summons**

**CIVIL SUMMONS** issued on **10/29/2025** by way of **RETURNED TO ATTORNEY/PETITIONER**
**CIVIL SUMMONS** issued on **06/11/2025** by way of **RETURNED TO ATTORNEY/PETITIONER**

**DABBLE SPORTS PAY LTD** as **DEFENDANT / RESPONDENT**

**Summons**

**CIVIL SUMMONS** issued on **06/11/2025** by way of **RETURNED TO ATTORNEY/PETITIONER**

**DABBLE SPORTS PTY LTD** as **DEFENDANT / RESPONDENT**

**Summons**

**CIVIL SUMMONS** issued on **10/29/2025** by way of **RETURNED TO ATTORNEY/PETITIONER**

**DABBLE SPORTS, LLC** as **DEFENDANT / RESPONDENT**

**Summons**

**CIVIL SUMMONS** issued on **10/29/2025** by way of **RETURNED TO ATTORNEY/PETITIONER**
**CIVIL SUMMONS** issued on **06/11/2025** by way of **RETURNED TO ATTORNEY/PETITIONER**

**KENTUCKY GAMBLING RECOVERY LLC** as **PLAINTIFF / PETITIONER**
**SCPS LLC DBA ZULA CASINO** as **DEFENDANT / RESPONDENT**

**Summons**

**CIVIL SUMMONS** issued on **10/29/2025** by way of **RETURNED TO ATTORNEY/PETITIONER**
**CIVIL SUMMONS** issued on **06/11/2025** by way of **RETURNED TO ATTORNEY/PETITIONER**

**UNDERDOG SPORTS HOLDINGS, INC. DBA UNDE** as **DEFENDANT / RESPONDENT**

**Summons**

**CIVIL SUMMONS** issued on **10/29/2025** by way of **RETURNED TO ATTORNEY/PETITIONER**
**CIVIL SUMMONS** issued on **06/11/2025** by way of **RETURNED TO ATTORNEY/PETITIONER**

**GREENWELL, GRACE** as **ATTORNEY FOR PLAINTIFF**

**Address**

GREENWELL LAW PLC
1041 GOSS AVENUE
LOUISVILLE KY 40217

**WEATHERHOLT, TIMOTHY JAMES** as **ATTORNEY FOR DEFENDANT**

**Address**

FISHER & PHILLIPS, LLP
220 W. MAIN STREET, SUITE 1700

LOUISVILLE KY 40202

| Documents | 25-CI-00513 |
|---|---|

**COMPLAINT / PETITION** filed on **06/11/2025**
*COMPLAINT;*

**AMENDED COMPLAINT** filed on **10/28/2025**
*AMENDED COMPLAINT;*

**AMENDED COMPLAINT** filed on **10/28/2025**
*FIRST AMENDED COMPLAINT;*

**AMENDED COMPLAINT** filed on **10/29/2025**
*FIRST AMENDED COMPLAINT;*

**EXHIBIT** filed on **10/29/2025**
*ORIGINAL COMPLAINT;*

**STIPULATION** filed on **11/19/2025**
*JOINT STIPULATION REGARDING EXTENSION OF TIME TO FILE ANSWER OR OTHERWISE RESPOND TO PLAINTIFF'S COMPLAINT;*

| Images | 25-CI-00513 |
|---|---|

**COMPLAINT / PETITION** filed on **06/11/2025**   *Page(s): 27*

**SUMMONS** filed on **06/11/2025**   *Page(s): 1*

**SUMMONS** filed on **06/11/2025**   *Page(s): 1*

**SUMMONS** filed on **06/11/2025**   *Page(s): 1*

**SUMMONS** filed on **06/11/2025**   *Page(s): 1*

**SUMMONS** filed on **06/11/2025**   *Page(s): 1*

**SUMMONS** filed on **06/11/2025**   *Page(s): 1*

**COURTESY FINANCIAL TRANSACTION REPORT** filed on **06/11/2025**   *Page(s): 1*

**RECEIPT** filed on **06/13/2025**   *Page(s): 0*

**AMENDED COMPLAINT** filed on **10/28/2025**   *Page(s): 27*

**AMENDED COMPLAINT** filed on **10/28/2025**   *Page(s): 27*

**EXHIBIT** filed on **10/29/2025**   *Page(s): 34*

**SUMMONS** filed on **10/29/2025**   *Page(s): 1*

**SUMMONS** filed on **10/29/2025**   *Page(s): 1*

**SUMMONS** filed on **10/29/2025**   *Page(s): 1*

**SUMMONS** filed on **10/29/2025**   *Page(s): 1*

**SUMMONS** filed on **10/29/2025**   *Page(s): 1*

**SUMMONS** filed on **10/29/2025**   *Page(s): 1*

**AMENDED COMPLAINT** filed on **10/29/2025**   *Page(s): 27*

**STIPULATION** filed on **11/19/2025**   *Page(s): 2*

**\*\*\*\* End of Case Number : 25-CI-00513 \*\*\*\***